Opinion filed January 25, 2007


















 
 
  
 
 







 
 
  
 
 




Opinion filed January 25, 2007

 

 

                                                                         In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-06-00157-CV 

                                                    __________

 

                      IN THE INTEREST OF D.S. AND J.J., CHILDREN

 



 

                                         On
Appeal from the 326th District Court

 

                                                          Taylor County,
Texas

 

                                                 Trial
Court Cause No. 5909-CX

 



 

                                             M
E M O R A N D U M   O P I N I O N

This case involves the involuntary termination of
parental rights under Tex. Fam. Code Ann.
ch. 161 (Vernon 2002 & Supp. 2006). 
The trial court terminated the parent-child relationship between
Jacqueline Sheffield and her children D.S. and J.J.  Sheffield
argues in four issues on appeal that the evidence was legally and factually
insufficient to support the trial court=s
order for termination.  We affirm.

                                                                Factual
Summary








Sheffield is the
mother of D.S. and J.J.  D.S. was born on
May 17, 2002, and J.J. was born on September 27, 2004.  The Texas Department of Health and Family
Protective Services became involved with the family in November 2004.  The trial court named the Department as the
temporary managing conservator of the children in November 2004, and the
Department placed the children in foster care. 
The primary risk for the family environment was Sheffield=s drug abuse.  Sheffield
admitted that she used drugs, specifically crack cocaine, during her pregnancy
with J.J.  J.J. was a premature baby born
of about thirty or thirty-one weeks gestation. 
J.J. had cocaine in his system at birth, and he also had congenital
syphilis.  Sheffield
stopped using drugs for some period of time when J.J. was in the hospital, but
she started using cocaine again while J.J was still in the hospital. J.J. has a
profound hearing loss, probably related to the congenital syphilis.

The Department initially sought to reunify Sheffield with her children.  In December 2004, Sheffield
signed a family service plan.  Sheffield complied with some of the requirements in the
plan, but she failed to comply with others. 
She missed numerous scheduled visits with her children. She also had a
number of positive tests for drugs.  Sheffield was unable to keep steady employment and did
not have a stable home environment.  She
moved around from place to place, staying with friends.  During the summer of 2005, she moved in with
her father in his house in Abilene.  She was serving probation for six years for a
2003 robbery conviction.  Because Sheffield could not get off of drugs, she requested to go
to the Substance Abuse Felony Punishment Facility.  She spent eight months in SAFPF.  Sheffield was released from SAFPF on March
20, 2006, and was then admitted  for a
ninety-day stay at the Oak Tree facility, a halfway house in Abilene. 
However, Sheffield was discharged from
the Oak Tree facility the following week when she tested positive for alcohol.

On April 25, 2006, and on May 8, 2006, the trial
court conducted a bench trial in this cause. 
The trial court found by clear and convincing evidence that Sheffield:

(1)
engaged in conduct or knowingly placed the children with persons who engaged in
conduct which endangers the physical or emotional well-being of the children;

 

(2)
constructively abandoned the children who have been in the permanent or
temporary managing conservatorship of the Department of Family and Protective
Services or an authorized agency for not less than six months and: (1) the
Department or authorized agency has made reasonable efforts to return the
children to the mother; (2) the mother has not regularly visited or maintained
significant contact with the children; and (3) the mother has demonstrated an
inability to provide the children with a safe environment; and

 








(3)
failed to comply with the provisions of a court order that specifically
established the actions necessary for the mother to obtain the return of the
children who have been in the permanent or temporary managing conservatorship
of the Department of Family and Protective Services for not less than nine
months as a result of the children=s
removal from the parent under Chapter 262 for the abuse or neglect of the
children.

 

The trial court further found that termination of the
parent-child relationship between Sheffield
and the children was in the children=s
best interest.[1]

                                                     Issues
on Appeal

Sheffield
presents four issues for review.  In the
issues, she challenges the legal and factual sufficiency of the trial court=s findings set forth above.

                                                  Standard
of Review

Texas
courts have long recognized that the natural right existing between a parent
and a child is of Aconstitutional
dimensions.@  Wiley v. Spratlan, 543 S.W.2d 349, 352
(Tex.
1976).  There is a strong presumption
that the best interest of a child is served by keeping the child with the
natural parent.  In re G.M., 596
S.W.2d 846 (Tex.
1980).  Thus, involuntary termination
statutes are strictly scrutinized in favor of the parent.  Holick v. Smith, 685 S.W.2d 18, 20-21
(Tex. 1985).

Due process requires that the grounds for
termination be established by clear and convincing evidence.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002) (citing Santosky
v. Kramer, 455 U.S.
745, 769 (1982)); In re J.P.H. & S.P.H., 196 S.W.3d 289, 292 (Tex.
App.C Eastland
2006, no pet.).  This requires a measure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.  Tex. Fam. Code Ann. '
101.007 (Vernon 2002); In re J.P.H. & S.P.H., 196 S.W.3d at
292.         








When conducting a legal sufficiency review, we
review the entire record in the light most favorable to the finding and
determine whether a reasonable trier of fact could have formed a firm belief or
conviction that its finding was true.  City
of Keller v. Wilson,
168 S.W.3d 802, 817 (Tex.
2005); In re J.F.C., 96 S.W.3d at 266; In re J.P.H. & S.P.H.,
196 S.W.3d at 292.  We must assume that
the fact-finder resolved disputed facts in favor of its finding.  Phillips v. Tex.
Dep=t of
Protective & Regulatory Servs., 149 S.W.3d 814, 817 (Tex. App.CEastland
2004, no pet.).  We must also disregard
all evidence that a reasonable fact-finder could have disbelieved or found
incredible, but we cannot disregard undisputed facts.   In re J.F.C., 96 S.W.3d at 266.

When conducting a factual sufficiency review, we
review the entire record, including evidence in support of and contrary to the
judgment, and give due consideration to evidence the trial court could have
found to be clear and convincing.  In
re C.H., 89 S.W.3d 17, 25 (Tex.
2002);  In re J.P.H. & S.P.H.,
196 S.W.3d at 292.  We then determine
whether the evidence is such that a fact-finder could reasonably form a firm
belief or conviction about the truth of the State=s
allegations.  In re C.H., 89 S.W.3d
at 25; In re J.P.H. & S.P.H., 196 S.W.3d at 292.  We also consider whether any disputed
evidence is such that a reasonable fact-finder could not have resolved that
evidence in favor of its finding.  In
re J.F.C., 96 S.W.3d at 266.

                                                          Grounds
for Termination

To terminate parental rights, the proponent must
prove by clear and convincing evidence that a parent committed one or more of
the acts or omissions set forth in Section 161.001(1) and that termination of
parental rights is in the child=s
best interest.  In re J.L., 163
S.W.3d 79, 84 (Tex. 2005); In re B.L.D.
& B.R.D., 113 S.W.3d 340, 353-54 (Tex.
2003); Richardson v. Green, 677
S.W.2d 497, 499 (Tex.
1984).  Section 161.001(1)(E) allows for
termination of parental rights if the parent Aengaged
in conduct or knowingly placed the child with persons who engaged in conduct
which endangers the physical or emotional well-being of the child.@








AEndanger@ means more than a threat of
metaphysical injury or a less-than-ideal environment:  the conduct need not actually injure the
child nor is it necessary that the conduct be directed at the child.  Tex.
Dep=t of
Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). 
The Department need not establish the specific danger to the child=s well-being as an independent
proposition; the danger may be inferred from parental misconduct.  In re J.J. & K.J., 911 S.W.2d 437,
440 (Tex. App.CTexarkana
1995, writ denied).  To determine whether
termination is necessary because of endangerment, courts may look to parental
conduct both before and after the child=s
birth.  In re T.N., B.N., & K.N.,
180 S.W.3d 376, 383 (Tex. App.CAmarillo
2005, no pet.); In re U.P., 105 S.W.3d 222, 234 (Tex. App.CHouston [14th Dist.] 2003, pet.
denied); In re D.M., B.W., & J.C.W., 58 S.W.3d 801, 812 (Tex. App.CFort Worth 2001, no pet.).  Drug abuse during pregnancy constitutes
conduct that endangers a child=s
physical and emotional well-being.  In
re W.A.B., 979 S.W.2d 804, 806 (Tex. App.CHouston
[14th Dist.] 1998, pet. denied); Dupree v. Tex. Dep=t
of Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas 1995, no writ).  Conduct that
subjects a child to a life of uncertainty and instability also endangers the
child=s
physical and emotional well-being.  In
re S.D. & K.D., 980 S.W.2d 758, 763 (Tex. App.CSan
Antonio 1998, pet. denied).  Endangerment
may also be satisfied by showing that a parent engaged in a Acourse of conduct@ that endangered the child=s physical or emotional
well-being.  Boyd, 727 S.W.2d at
534; In re U.P., 105 S.W.3d at 234.

Sheffield argues
in her first issue that the evidence was legally and factually insufficient to
support the trial court=s
finding that she engaged in conduct or knowingly placed the children with
persons who engaged in conduct that endangered the physical or emotional
well-being of the children.  We will
examine the record and determine, in accordance with the standards set out
above, whether the Department met its burden of proof.  

The evidence showed that Sheffield
was twenty-two years old at the time of trial. 
D.S. was born on May 17, 2002, and J.J was born on September 27,
2004.  Sheffield
testified that she received a six-year probated sentence for a robbery conviction
in 2003.  The Department presented
evidence establishing a long history of drug abuse on the part of Sheffield.  Sheffield testified that she began using drugs when she
was fifteen years old and and that she continued to use them on a regular basis
until she was twenty-two years old.  Sheffield described crack cocaine as her drug of choice,
but she said that she had used other illegal drugs in the past.  Sheffield
said that she used cocaine during her pregnancy with J.J.  Sheffield and J.J. both had cocaine in their
systems when J.J. was born at  Abilene Regional Medical
 Center.  








J.J. was a premature baby of about thirty to
thirty-one weeks gestation.  Dr. James R.
Marshall, a neonatologist, testified that he had been J.J.=s attending physician since birth.  Dr. Marshall said that the use of cocaine and
related drugs may result in premature labor. 
J.J. was placed in the neonatal intensive care unit at the
hospital.  Dr. Marshall diagnosed J.J.
with, and treated J.J. for, congenital syphilis.  Dr. Marshall said that J.J. had a profound
hearing loss B probably
caused by the congenital syphilis B
and that J.J. was fitted with hearing aids. 
Dr. Marshall also said that J.J. had significant developmental
delay.  Dr. Marshall believed that J.J.
was periodically being seen at the West
 Texas Rehabilitation
 Center for speech and
language and occupational therapy evaluations. 
Dr. Marshall testified that J.J. was discharged from the hospital seven
or eight weeks after his birth.

The Department became temporary managing
conservator of  D.S. and J.J. during
November 2004.  Sheffield
said that she did not use drugs for some period of time while J.J. was in the
hospital.  Sheffield
received inpatient treatment for her drug addiction problems at the Jubilee
House toward the end of 2004 and into 2005, but she did not successfully
complete the program.  Sheffield
said that she Aslid back
into [her] addiction@
while J.J. was still in the hospital. 
J.J. went directly from the hospital into the foster home.  The Department placed D.S. in the same foster
home, and D.S. and J.J. remained together in the same foster home up until the
time of trial.  Sheffield
acknowledged that she used drugs on a regular basis after the Department
removed her children from her.

Sheffield agreed
that the Department=s initial
plan was to reunify D.S. and J.J. with her. 
In December 2004, Sheffield signed a
family service plan.  Sheffield
agreed to perform a number of requirements in the plan.  The plan required in part that Sheffield
complete a psychological evaluation, complete a drug assessment, attend drug
therapy sessions, attend counseling for improvement of parenting skills, enroll
in a GED class and make satisfactory progress toward her GED, secure adequate
housing for D.S. and J.J., save money in order to establish a safe home for the
children, attend twice weekly visits with D.S. and J.J., attend all of D.S.=s and J.J.=s
medical appointments, demonstrate that she understood and could meet D.S.=s and J.J.=s
medical needs, comply with the terms of her probation, and complete a narcotics
anonymous program.

Sheffield
complied with some of these requirements. 
For example, she submitted to a psychological evaluation and completed
the drug assessment.  However, the
evidence established that Sheffield failed to
comply with many aspects of the plan after she Aslid
back into [her] addiction.@  For example, Sheffield
said that she stopped going to drug counseling and that she Adropped@
parenting and counseling sessions when she started using drugs again.  Sheffield
also started missing visits with D.S. and J.J. 
Sheffield said that she missed twelve
visits in a row during one period of time. 
At the time of trial, Sheffield had not
obtained her GED.  Sheffield
testified that she had lived in a lot of different places with friends since
the Department had removed her children. Sheffield
said that she had not maintained steady employment and that she was looking for
a job at the time of trial.  She also
said that she had no source of income at the time of trial.








Dr. Stephen M. Osborne, a clinical psychologist,
performed a psychological evaluation of Sheffield
in December 2004.  Dr. Osborne testified
that he diagnosed Sheffield Awith several major personality
disorders that are of serious concern.@  He testified that individuals with these
types of personality disorders usually Arequire
fairly intensive therapeutic intervention or major life changes@ in order to make changes.  Dr. Osborne believed that Sheffield
would put D.S.=s and
J.J.=s needs
secondary to her own needs.  

Sheffield=s
father, Michael Don (Mike) Sheffield, bought a house in Abilene in 2005. Sheffield
testified that she moved in with her father during the summer 2005.  Sheffield
said that she went to SAFPF in August 2005. 
Sheffield testified that, before going
to SAFPF, her choice of drugs was A[e]verything.@ 
Sheffield said that she was using
cocaine, methamphetamine, and Ecstasy. Sheffield
also said that she had eight or nine positive drug tests before going to
SAFPF.  Sheffield
did not believe that she would be alive if she had not turned herself in and
gone to SAFPF.

Christina Moroz, a Taylor County Probation
Officer, testified that Sheffield was sent to
SAFPF in August 2005 for ongoing substance abuse problems.  Sheffield
requested to go to SAFPF. Sheffield spent
eight months at SAFPF.  Sheffield
presented evidence that, while she was at SAFPF, she completed various classes,
including two parenting classes.  She
also did some work toward her GED and took classes related to obtaining
employment.  Sheffield
successfully completed the SAFPF program, and she was released from SAFPF on
March 20, 2006.  When Sheffield left
SAFPF, she went to the Oak Tree facility, a halfway house in Abilene, for a ninety-day program. Officer
Moroz referred to the facility as a Serenity House and a treatment center.  Sheffield
was discharged from Oak Tree about a week after she arrived for violating its
no alcohol policy.  Officer Moroz
testified that Sheffield admitted to drinking alcohol at Oak Tree and that Sheffield knew what she did was wrong.  Officer Moroz said that, because of Sheffield=s discharge from the Oak Tree facility,
the Taylor County District Attorney had recommended filing a motion to revoke Sheffield=s
probation.  Officer Moroz also said that
the district attorney had recommended revoking Sheffield=s probation and sending her to prison.








Sheffield moved
back in with her father, Mike Sheffield, after leaving the Oak Tree
facility.  Mike Sheffield=s fiancee, Amy Fincher, and three of
Fincher=s
children also lived at the house. Sheffield
said that she planned to live at her father=s
house until she had the resources to get a place of her own.  Sheffield=s
father testified that Sheffield, D.S., and
J.J. would be welcome to live with him for as long as needed.  Sheffield=s father believed that his house would
provide a stable and safe place for D.S. and J.J. to live.  He said that he and Fincher would take care
of D.S. and J.J. until Sheffield could take
care of them.  Sheffield=s father testified that Sheffield had straightened up and that he believed she
would be able to stay off of drugs.  Sheffield believed that she was a drug addict before
going to SAFPF.  She testified that she
had not used any illegal drugs since leaving SAFPF. 

Sheffield said
that she was concerned her probation would be revoked as a result of her  discharge from the Oak Tree facility.  She understood that she was facing the
possibility of being sent to prison to complete her sentence.  The trial took place on April 25, 2006, and
on May 8, 2006. Sheffield was arrested on
April 28, 2006, on a motion to revoke her probation and was in jail on May 8,
2006.  As of May 8, 2006, Sheffield had not seen D.S. and J.J. since before going
to SAFPF in August 2005.  Sheffield did not ask for custody of D.S. and J.J. at
trial.  She knew that she was unable to
take care of D.S. and J.J. at that time. 
She requested time to prove that she could take care of her children.  Sheffield
testified that it should only take her six months to demonstrate that she could
appropriately care for D.S. and J.J.

Sherry Faulkenberry, a caseworker for the
Department, testified that she was the caseworker for D.S. and J.J.  Faulkenberry said that the Department=s permanency goal for D.S. and J.J. was
for them to be adopted.  The Department=s original goal was for family
reunification, and the Department crafted a permanency plan B the family service plan B consistent with that goal.  Faulkenberry confirmed Sheffield=s testimony that Sheffield complied
with some of the requirements in the plan but that Sheffield
failed to comply with many aspects of the plan. 
For example, Faulkenberry said that Sheffield
did not comply with the counseling and therapy aspects of the plan. She said
that Sheffield did not attend the parenting
classes required by the plan. 
Faulkenberry also said that, up through March and April 2005, Sheffield attended most of the visits with D.S. and J.J.
as set forth in the plan.  However, Sheffield later began missing the visits with D.S. and
J.J. on a more frequent basis.    








Faulkenberry testified about the needs and
conditions of D.S. and J.J.  Faulkenberry
said that D.S. had some behavioral and social problems, but that she was
improving.  D.S. was receiving speech
therapy at the Anson Early Head Start program. 
Faulkenberry said that J.J. was doing very well.  She said that J.J. was receiving massage
therapy, auditory therapy, and speech therapy. 
J.J. was also receiving instruction in sign language so that he would be
able to communicate.

Faulkenberry testified that all of  D.S.=s
and J.J.=s needs
were being met at the time of trial.  She
believed that D.S. and J.J. needed to continue receiving the services that the
Department was providing.  Faulkenberry
said that the Department had the resources necessary to provide for their
future needs.  She said that the foster
parents were willing to keep D.S. and J.J. in their home until the Department
was able to find an adoptive placement for them and that the foster home provided
them with a stable environment. 
Faulkenberry testified that there was no reason to believe that D.S. and
J.J. would not be successfully adopted and that there should be no difficulty
in locating an adoptive home for the children together.  She said that Sheffield had not demonstrated
an ability to take care of D.S. and J.J. and that, over the last eighteen
months, Sheffield had failed to maintain
significant and regular contact with the children.








Applying the above sufficiency standards, the
evidence in this case, which we have set forth in detail above, was legally and
factually sufficient to support the trial court=s
finding that Sheffield engaged in conduct that
endangered the physical or emotional well-being of D.S. and J.J.  The evidence established that Sheffield had a long history of drug abuse.  She started using illegal drugs at the age of
fifteen, and she routinely used drugs until she reached the age of
twenty-two.  She was convicted of robbery
after D.S. was born.  Sheffield
used drugs during her pregnancy with J.J. 
J.J. suffered actual injury as a result of Sheffield=s conduct.  J.J. was born with cocaine in his system and
with congenital syphilis.  He has a
profound hearing loss and severe development delay.  Sheffield=s drug addiction, including her use of
cocaine while she was pregnant with J.J., constitutes conduct that endangered
the physical and emotional well-being of D.S. and J.J.  See In re W.A.B., 979 S.W.2d at 806; Dupree,
907 S.W.2d at 84.  The evidence
established that Sheffield Aslid back into [her] addiction@ after agreeing to the family service
plan.  A parent=s
engagement in illegal drug activity after agreeing not to do so in a service
plan for reunification with her children is sufficient to establish clear and
convincing proof of voluntary, deliberate, and conscious conduct that
endangered the well-being of her children.  
In re T.N., B.N., & K.N., 180 S.W.3d at 383.  The record also demonstrates that Sheffield engaged in a course of conduct that endangered
the physical and emotional well-being of D.S. and J.J.  Her criminal history, use of illegal drugs
while on probation, lack of contact with D.S. and J.J., inability to secure
stable employment, and subjecting D.S. and J.J. to lives of uncertainty and
instability constitute grounds for termination under Section 161.001(1)(E). See
In re W.A.B., 979 S.W.2d at 807.

We overrule Sheffield=s first appellate issue.  Because we have concluded that there was both
legally and factually sufficient evidence to support the trial court=s finding under Section 161.001(1)(E),
we need not address Sheffield=s
second and third issues regarding sufficiency of the evidence to support the
trial court=s
findings under Section 161.001(1)(N), (O). 
Only one finding alleged under Section 161.001(1) is necessary for a
judgment of termination.  In re D.M.,
B.W., & J.C.W., 58 S.W.3d 801; In re S.F., 32 S.W.3d 318, 320 (Tex. App.CSan Antonio 2000, no pet.); see also
Tex. R. App. P. 47.1.

                                        Is
Termination in D.S.=s
and J.J.=s Best
Interest?








Sheffield argues
in her fourth issue that the evidence was legally and factually insufficient to
support the trial court=s
finding that termination of her parental rights was in D.S.=s and J.J.=s
best interest.  In deciding whether the
evidence is sufficient to support a trial court=s
finding that termination is in the children=s
best interest, we are guided by the nonexclusive list of factors set forth in Holley
v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).  Those factors include: (1) the desires of the
children; (2) the emotional and physical needs of the children now and in the
future; (3) the emotional and physical danger to the children now and in the
future; (4) the parental abilities of the individuals seeking custody; (5) the
programs available to assist these individuals to promote the best interest of
the children; (6) the plans for the children by the agency seeking custody; (7)
the stability of the home or proposed placement; (8) the acts or omissions of
the parent that  may indicate that the
existing parent-child relationship is not a proper one; and (9) any excuse for
the acts or omissions of the parent.  Id.; In re
C.A.J., 122 S.W.3d 888, 892-93 (Tex. App.CFort
Worth 2003, no pet).  These factors are
not exhaustive, nor must all of the factors be proved as a condition precedent
to parental termination.   See In
re C.H., 89 S.W.3d at 27; Vasquez v. Tex. Dep=t
of Protective & Regulatory Servs., 190 S.W.3d 189, 196 (Tex. App.CHouston [1st Dist.] 2005, pet. denied).  The absence of evidence of some of these
considerations would not preclude a fact-finder from reasonably forming a
strong conviction or belief that termination was in the children=s best interest, particularly if the
evidence was undisputed that the parental relationship endangered the safety of
the children.  See In re C.H.,
89 S.W.3d at 27.

The Department relies, in part, on Sheffield=s
long history of drug use, criminal conduct, and instability as evidence
supporting the trial court=s
best-interest finding.  Evidence of a
parent=s
continuous and long-term drug use, unstable lifestyle, and criminal record will
support a trial court=s
finding that termination of the parent-child relationship is in the best
interest of the child.  In re C.A.J.,
122 S.W.3d at 894.  The evidence at trial
established Sheffield=s
continuous and long-term drug use.  Sheffield used cocaine during her pregnancy with
J.J.  Although Sheffield
said that she stopped using drugs after the Department removed her children
from her, she Aslid back
into [her] addiction@
shortly thereafter.  Sheffield
said that she received inpatient drug treatment for her drug addiction at the Jubilee
House toward the end of 2004 and into 2005 but that she did not successfully
complete the program.  She said that she
began using drugs again.

The evidence demonstrated that Sheffield
has not been able to provide for D.S.=s
and J.J.=s
emotional and physical needs.  Sheffield has not maintained steady employment.  She did not have any sources of income at the
time of trial.  Sheffield=s continued drug use after undergoing
treatment at the Jubilee House and after entering into the family service plan
demonstrated an inability to provide a stable environment for D.S. and J.J. and
an inability to provide for their emotional and physical needs.  AWithout
stability, income, or a home, [a parent] is unable to provide for the child=s emotional and physical needs.@ 
In re C.A.J., 122 S.W.3d at 894. 
Additionally, at the time of trial, Sheffield
was in jail and faced the possibility of prison time as a result of her 2003
robbery conviction.  Based on the
evidence, the trial court could have concluded that Sheffield
could not appropriately care for D.S.=s
and J.J.=s
physical and emotional well-being in the future.  The evidence also showed that Sheffield did not have the parental ability to properly
care for D.S. and J.J.  Sheffield
admitted that she did not have the ability to take care of them at the time of
trial.








Faulkenberry testified that the foster parents
were willing to keep D.S. and J.J. in their home until the Department was able
to find an adoptive placement for them. 
She said that the foster placement provided the children with a stable
environment.  Faulkenberry also said that
D.S.=s and
J.J.=s needs
were being met at the time of trial and that the Department had the resources
necessary to provide for their future needs. 
Based on the evidence, the trial court could have concluded that the
Department had provided, and could in the future provide, D.S. and J.J with a
stable home environment.  

In light of the Holley factors, we find
that the evidence was legally and factually sufficient to support the trial
court=s finding
that termination of Sheffield=s rights was in the best interest of
D.S. and J.J.  We overrule Sheffield=s
fourth issue.

                                                               This
Court=s Ruling

We affirm the order of the trial court.                             

 

TERRY McCALL

JUSTICE

January 25, 2007

Panel
consists of:  Wright, C.J.,

McCall,
J., and Strange, J.











[1]Sheffield provided names of potential fathers of the children to
the Department.  At the time of trial,
paternity testing had ruled out two men as being the father of D.S. and one man
as being the father of J.J.  Thus, the
fathers of the children are unknown. The trial court terminated the parental
rights of the unknown father of D.S. and the parental rights of the unknown
father of J.J.   There are no appeals
from these terminations.