**Stephanie PHILLIPS and Charley Dee Phillips, Appellants,**

v.

**TEXAS DEPARTMENT OF PROTECTIVE AND REGULATORY SERVICES, Appellee.**

No. 11–02–00181–CV.

Court of Appeals of Texas, Eastland.

Sept. 30, 2004.

Fred I. Franklin, Jr., Mark Bessent, Law Office of Mark T. Bessent, P.C., Brownwood, for appellants.

Shane Britton, County Atty., Brownwood, for appellee.

Charles P. McCain, Brownwood, for ad litem.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

Opinion

JIM R. WRIGHT, Justice.

After the jury had returned its verdict, the trial court entered its order in accor-

dance with that verdict terminating the parent-child relationship between Stephanie Phillips and Charley Dee Phillips and their child, A.P. Because the evidence is legally and factually sufficient to support the verdict and judgment and because the trial court had jurisdiction of the case, we affirm.

Charley argues in his first issue on appeal that the evidence is both legally and factually insufficient to support the verdict. In Charley's second issue, he argues that the trial court did not have jurisdiction of the case because it did not enter an appropriate order under TEX. FAM. CODE ANN. § 263.401 (Vernon 2002). Stephanie makes that same argument in her sole issue on appeal. We will discuss the jurisdictional argument first.

Section 263.401(a) provides for the dismissal of suits such as this under certain circumstances. If the trial court has neither entered a final order nor granted an extension by the first Monday after the first anniversary of the date it entered temporary orders appointing the Texas Department of Protective and Regulatory Services (the Department) as temporary managing conservator, then it shall dismiss a suit affecting the parent-child relationship filed by the Department that requests termination of the parent-child relationship or that requests that the Department be named conservator of the child.

Section 263.401(b) contains provisions which allow the trial court to extend the dismissal date and to retain the suit on the docket for an additional period of 180 days if it finds that continuing the appointment of the Department would be in the best interest of the child. The order of extension must contain a new date for dismissal that is not later than 180 days of the date called for in Section 263.401(a). The order must also provide for further temporary orders as necessary for the protection of the child and as necessary to avoid further delay. Further, the court must set forth in the order a date for a final hearing; the date must be before the required date for dismissal.

■ Appellants claim that the trial court did not enter an order that complied with Section 263.401. On December 22, 2000, the trial court entered temporary orders in which it appointed the Department as temporary managing conservator of A.P. On November 30, 2001, a permanency hearing was conducted. The trial court announced that it was extending the deadline "to the next six month period from today's date." The trial court further announced: "The extension will be granted as requested." The trial court then set the case for final disposition before a jury on April 8, 2002. The trial court entered a written order to that effect on March 1, 2002.

There was another permanency hearing held on March 22, 2002. Charley's attorney called for dismissal claiming that the trial court did not have jurisdiction because of its failure to enter a signed order in accordance with Section 263.401. A.P.'s attorney ad litem also expressed concern over the claimed lack of compliance. The motion to dismiss was denied, and the case later proceeded to trial before a jury in May 2002.

The first Monday after the expiration of one year from the date of the temporary orders in this case was December 24, 2001, the date on which the trial court would be required to dismiss the case unless it had entered a final order or an extension under Section 263.401(b). We hold that the trial court's oral pronouncement satisfied the requirements of Section 263.401(b).

■ The trial court rendered its decision when it made the oral pronouncements at the November 30, 2001, perma-

nency hearing. When a trial court, in open court, orally announces its decision, it has rendered judgment. *S & A Restaurant Corporation v. Leal,* 892 S.W.2d 855, 857 (Tex.1995). The trial court must clearly indicate its intent to render judgment at the time the words are expressed. *S & A Restaurant Corporation v. Leal, supra* at 858. Here, in its oral rendition, the trial court stated that the extension was granted "to the next six month period from today's date." That date would have been May 30, 2002. In the order, the trial court also set the date for the final hearing, April 8, 2002, a date within the extension period. The case was actually tried before the May 30 dismissal date. The trial court complied with Section 263.401. *See In re Bishop,* 8 S.W.3d 412, 418 (Tex. App.-Waco 1999, no pet'n); *cf. In re D.D.M.,* 116 S.W.3d 224, 230–31 (Tex.App.-Tyler 2003, no pet'n). Charley's second issue on appeal is overruled. Stephanie's sole issue on appeal also is overruled.

In his first issue on appeal, Charley argues that the evidence is both legally and factually insufficient to support the findings of the jury. We review these propositions under a heightened standard.

In our review of a legal insufficiency claim, we will examine all of the evidence in the light most favorable to the finding and determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002). We must assume that the fact finder resolved disputed facts in favor of its finding. *In re J.F.C., supra.*

In a factual sufficiency review, we will give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing. *In re C.H.,* 89 S.W.3d 17, 25 (Tex.2002). We determine whether the evidence is such that a fact finder could reasonably form a firm belief

or conviction about the truth of the State's allegations. *In re C.H., supra.* We also consider whether any disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C., supra* at 266.

The Department sought termination under TEX. FAM. CODE ANN. § 161.001(1)(D) & (E) (Vernon 2002). Section 161.001(1)(D) & (E) allows for termination if the Department shows by clear and convincing evidence:

(1) That the parent has:

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; or

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child.

There must also be a finding that termination is in the best interest of the child.

"Endanger" means more than a threat of metaphysical injury or a less than ideal environment, but the conduct need not actually injure the child, nor is it necessary that the conduct be directed at the child. "Endanger" "means to expose to loss or injury; to jeopardize." *Texas Department of Human Services v. Boyd,* 727 S.W.2d 531, 533 (Tex.1987). The Department need not establish the specific danger to the child's well-being as an independent proposition; the danger may be inferred from parental misconduct. *In the Interest of J.J. and K.J.,* 911 S.W.2d 437, 440 (Tex.App.-Texarkana 1995, writ den'd). *Boyd* also instructs us that, if the evidence including evidence of incarceration, shows that a parent has engaged in a course of conduct that has the effect of endangering

the physical or emotional well-being of the child, an affirmative finding under Section 161.001(1)(E) is proper. We hold that the same is true as to Section 161.001(1)(D).

■ We will examine the record and determine, in accordance with the standards set out above, whether the Department met its burden of proof.

Charley did not attend the termination hearing; and there is, therefore, no testimony from him in the record.

The record does reveal that on November 25, 2000, Stephanie's aunt learned that Stephanie's three children were home alone.[1] She telephoned the Brownwood Police Department. Officer Scott Byrd went to Stephanie's home. He called "Child Protective Services," and the children were taken to the Brownwood Police Station. The children were given food at the Brownwood Police Department but did not appear to be extremely hungry. A.P. was later placed in foster care.

Officer Byrd testified that the day he went to Stephanie's home was a cold day and that the children were "barely clothed." The home was very dirty, and clothes and trash were everywhere. Old food was lying on the floor where the children slept. Roaches had infested the house. While Officer Byrd found almost no edible food in the house, he did find some eggs and beer. There was a smell of natural gas throughout the whole house. The only heat in the house came from one gas heater in the front room of the house. A.P.'s aunt testified that the stove was one with an open flame without any type of grill on it. There had been no water in the house for the month of November.

Emily Alford testified that she went to Stephanie's home to get some things for the children. She saw some dirty dishes in the sink, some canned goods, some clothes piled around the house, and some broken windows covered with plastic and cardboard.

Stephanie and Charley were married on February 14, 1996, and they separated in July 2000. Stephanie testified that, on the day that the children were left alone, she had gone to Burger King to get food. When she arrived home, her children were gone. She finally located them at the Brownwood Police Department. Stephanie testified that she was told to leave or that she would be arrested for "child abandonment." Stephanie said that they were in the process of moving and that that was why her house looked the way that it did.

Dana O'Conner with Child Protective Services testified that neither Charley nor Stephanie complied with service plans provided by the Department. They never attended parenting classes. Stephanie did not keep a drug assessment appointment, missed appointments for psychological evaluations, and did not live in any one place for any significant period of time. Stephanie lived in 3 homes from January until March during one of the years; and, in the first 40 months of A.P.'s life, he lived in 13 different places. Charley never attended any counseling sessions concerning his history of family violence. Further, he did not refrain from criminal acts and criminal elements; he did not undergo a drug and alcohol assessment; and he did not participate in drug and alcohol counseling.

Another employee of the Child Protective Services, Monica Cole, testified that,

---

1. At the time, Stephanie had three children who lived with her: 9–year–old S.K., 7–year–old K.P., and 3–year old A.P. (the child involved in this appeal). All three children have different fathers, and conservatorship of S.K. and K.P. was awarded to their respective fathers. This appeal is limited to A.P.

during her meetings with Charley, Charley smelled of alcohol. Charley would end visits with A.P. in such a manner as to bring fault upon A.P., and he would leave A.P. crying hysterically. Charley would also make inappropriate promises to A.P. that the family would be getting back together. Charley's visits with A.P. became more sporadic by March 2001. By September 2001, there was neither contact between Charley and A.P. nor between Charley and the Department.

Pam King was A.P.'s foster mother. She told the jury that, when she first received A.P., he had lice and poor bathroom habits. A.P. was underweight, anemic, and would often cry. A.P. was afraid that King would leave him.

Russell Fisher was a court-appointed special advocate for A.P. Fisher performed an independent investigation in this case. He testified as to the lifestyles of A.P.'s parents and to the fact that Charley and Stephanie had both placed A.P. in dangerous situations. It was Fisher's opinion that A.P. would follow their history of violence, alcohol abuse, and drug abuse if placed with the parents.

Charley's propensity to violence was further testified to by William Michael Phaup, one of Stephanie's boyfriends. Phaup is also K.P.'s father. On one occasion, Charley assaulted him with a motorcycle chain. Charley split his eye, kicked in some ribs, and broke his shinbone. Further testimony as to Charley's violence came from his mother, also a victim of Charley's assaultive nature.

Stephanie had also assaulted Phaup. On one occasion, she had ruptured his spleen by hitting him with an aluminum baseball bat. On other occasions, she had ruptured his eardrum and had broken his nose.

Stephanie's mother, Rosa Hoffman, also testified to Charley's reputation as a violent, abusive person who regularly drank and did drugs. Stephanie's aunt, Diane Anderson, joined in that opinion and further offered her belief that she did not know whether Stephanie could ever change and become a better person.

Stephanie had been in and out of jail during A.P.'s life. The evidence shows that, during the first 36 months of A.P.'s life, Stephanie spent 18 of those months incarcerated and had been out of prison only 7 months when her children were removed from the home. In less than a year after her children were taken, she was again incarcerated after receiving a 4–year sentence on August 23, 2001.

Stephanie testified that she and Charley used methamphetamine, heroin, cocaine, and marihuana. They also smoked and injected "a lot of crack" at their house. They used these illegal drugs while the children were in the house. Charley also had a problem with alcohol and would drink "a case, a case-and-a-half" of beer on an average day "from the time he [woke up] in the morning until the time [he went] to bed and in between." Charley had a habit of carrying guns and knives. Both Stephanie and Charley had been incarcerated in the past. Although by Stephanie's own testimony Charley had physically abused her, had abused drugs and alcohol, had threatened her with a gun, had physically assaulted his other children, had physically assaulted "business associates" at their home, she had talked to Charley, also known as "Nasty," about getting back together. Charley's nickname became "Nasty" after he had been in a fight and had bitten off his opponent's nose and swallowed it; he had this nickname tattooed on his body. Stephanie told the jury that she would love Charley until the day that she died.

We find that the evidence is both legally and factually sufficient, under the standards that we have outlined, to support the termination of Charley's parent-child relationship under Section 161.001(1)(D) & (E). Charley's first issue on appeal, in both of its parts, is overruled.

The judgment of the trial court is affirmed.