Opinion filed April 16, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed April 16,
2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-08-00216-CV

                                                       ________

 

                     IN
THE INTEREST OF A.H. AND A.H., CHILDREN

 



 

                                          On
Appeal from the 91st District Court

 

                                                        Eastland
County, Texas

 

                                             Trial
Court Cause No. CV-07-40841

 



 

                                             M
E M O R A N D U M   O P I N I O N

After
some years of supervision by the Department of Family and Protective Services,
the trial court terminated the parental rights of O.C. Hill Jr. and April
Larance Hill to A.H., their eight-­year‑old son, and A.H., their four‑year‑old
daughter.  The trial court then appointed the Department as the permanent
managing conservator.  We affirm.








O.C.
raises four issues in this appeal.  In his first issue, O.C. complains that the
Department failed to meet its burden to prove that he knowingly placed or
knowingly allowed the children to remain in conditions or surroundings that
endangered their physical or emotional well‑being.  He also claims that
the Department failed to prove that he engaged in conduct or knowingly placed
the children with persons who engaged in conduct that endangered their physical
or emotional well­being.  O.C.=s
second issue relates to the trial court=s
action in allowing various witnesses to testify as experts when they had not
been qualified as such.  In Issue Three, O.C. complains that the trial court
erred when it allowed the Department to withdraw that portion of its pleadings
regarding alternative placement of the children.  Finally, in Issue Four, O.C.
maintains that he was denied effective assistance of counsel because trial
counsel did not present any witnesses to show his Aappropriateness as a parent.@

At
the outset, we must address the Department=s
position that O.C. did not file a statement of points on appeal as required
under the provisions of Tex. Fam. Code
Ann. ' 263.405
(Vernon  2008).  That section, in subdivision (b), contains language under the
terms of which a party who intends to appeal a final order of a trial court in
a termination suit must file a statement of the point or points on which the
party intends to appeal.  The statement may be combined with a notice of
appeal.  An appellate court is prohibited from considering any points on appeal
that have not been set forth in the statement of points on appeal.  Section
263.405(i).  It is not sufficient to claim only that the decision is contrary
to the evidence or that the evidence is legally or factually insufficient; such
claims do not preserve an issue for appeal.  Id.

O.C.
was required to file his statement of points on appeal by July 1, 2008; he did
not file it until July 7, 2008.  This same date, he also filed a motion for
extension of time to file the statement of points on appeal.  However, he did
not obtain a ruling on that motion.

O.C.
did file a notice of appeal.  In the relevant portion of that notice of appeal,
O.C. states:

O.C.
Hill desires to appeal from the ruling terminating his parental rights. The
State did not meet its burden to support such termination. O.C. Hill completed
all services and tasks requested by the State. He has never harmed the
children, they were clean and well fed, and he maintained a residence suitable
for the children to reside.

 

We
hold that the statements in O.C.=s
notice of appeal are in the nature of those proclaimed to be insufficient in
Section 263.405(i), and we are prohibited from considering his issues on
appeal. See In re K.C.B., 251 S.W.3d 514, 515 (Tex. 2008).








Furthermore,
in the statements contained in the notice of appeal, O.C. does not address the
alleged error of the trial court regarding expert witnesses, the abandonment of
the alternative placement theories originally alleged by the Department, or the
claim regarding effective representation by counsel.  Even if he had, O.C. made
no objections regarding the qualifications of the witnesses about whom he
complains, and he has waived any error in that regard.  Tex. R. App. P. 33.1(a).  Likewise, O.C. did not
object (assuming he could have) to the Department=s
abandonment of the alternative placement portion in its pleadings and has
waived any objection he might have had.  Id.  Additionally, we do not
know what the content of any witness testimony might have been if O.C.=s lawyer had called any
witnesses.  Tex. R. App. P. 33. 
Because we may not consider them, we overrule all of O.C.=s issues on appeal.

In
its Order of Termination, the trial court found that April had knowingly placed
or knowingly allowed the children to remain in conditions or surroundings that
endangered the physical or emotional well‑being of the children, that she
had engaged in conduct or knowingly placed the children with persons who
engaged in conduct that endangered the physical or emotional well­-being of the
children, and that she failed to comply with the provisions of a court order
that specifically established the actions necessary for her to obtain the
return of the children who had been in the permanent or temporary managing
conservatorship of the Department for not less than nine months as a result of
the children=s removal
from the parent for the abuse or neglect of the children.  These are all
findings that will support termination if the evidence is legally and factually
sufficient to support the findings. Tex.
Fam. Code Ann. '
161.001(1)(D), (E), (O) (Vernon 2008).   Additionally, the termination must be
in the best interest of the children as the trial court also found.  Tex. Fam. Code Ann. ' 161.001(2) (Vernon 2008). 
In four issues, April contends that the evidence is both legally and factually
insufficient to support those findings.

Texas
courts have long recognized that the natural right existing between a parent
and child is of Aconstitutional
dimensions.@  Wiley
v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976).  There is a strong
presumption that the best interest of a child is served by keeping the child
with the natural parent.  In re G.M., 596 S.W.2d 846 (Tex. 1980).  Thus,
involuntary termination proceedings and statutes are strictly scrutinized in
favor of the parent.  Holick v. Smith, 685 S.W.2d 18, 20‑21 (Tex.
1985).

Due
process requires that the grounds for termination be established by clear and
convincing evidence.  This requires that measure or degree of proof that will
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.  Tex. Fam. Code Ann. '
101.007 (Vernon 2008); Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 31
(Tex. 1994).








When
conducting a legal sufficiency review, we review the entire record in the light
most favorable to the finding and determine whether a reasonable trier of fact
could have formed a firm belief or conviction that its finding was true.  In
re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002).  We must assume that the trial
court resolved disputed facts in favor of its finding.  Phillips v. Tex. Dep=t  of Protective &
Regulatory Servs., 149 S.W.3d 814, 817 (Tex. App.CEastland 2004, no pet.).  We must also
disregard all evidence that a reasonable factfinder could have disbelieved or
found incredible, but we cannot disregard undisputed facts.  In re J.F.C.,
96 S.W.3d at 266.

When
conducting a factual sufficiency review, we give due consideration to the
evidence the trial court could reasonably have found to be true.  In re
J.F.C., 96 S.W.3d at 266.  We must determine whether the evidence is such
that the trial court could reasonably have formed a firm belief or conviction
regarding the allegations.  Id.  We must also consider whether the
disputed evidence is such that a reasonable factfinder could not have resolved
the disputed evidence in favor of its finding.  Id.  While we do not
view the evidence in the light most favorable to the challenged finding, our
review must maintain the respective roles of trial courts and appellate
courts.  In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  If, in light of the
entire record, the disputed evidence establishes that a reasonable factfinder
could not have formed a firm belief or conviction in favor of the finding, then
the evidence is factually insufficient.  In re J.F.C., 96 S.W.3d at 266.

In
addressing April=s
issues on appeal, it is necessary to review testimony relating to both parents.

Dr.
George Tipton, a psychiatrist employed by the Center for Life Resources (the
global Mental Health/Mental Retardation Center in Brownwood), saw O.C. for
psychological and psychiatric evaluations four times in 2005 and one time in
2007.  He also reviewed the records from two previous hospitalizations under
commitment to Kerrville State Hospital.  The first commitment was in 2001; the
last commitment was in 2002.

Dr.
Tipton=s diagnosis of
O.C., based upon his sessions with O.C. and the records that he reviewed, was Abipolar with psychotic
features.@  O.C. also
suffered from an antisocial personality.  Dr. Tipton explained that bipolar
disorder was a psychiatric condition dealing with mood lability.  It evidences
itself by episodes of mania B
Aagitation, rapid
speech, continuous movement, inability to sleep, angry outbursts, irritability@ B alternating with periods of depression B Aunhappy mood, thoughts that are derogatory of
yourself, inability to sleep, poor appetite, weight loss.@  Dr. Tipton also explained
that the term Aantisocial
personality@ was Aa description of an
individual=s behavior
and that an antisocial diagnosis would indicate that [O.C.] would tend not to
follow the rules of society.@








According
to Dr. Tipton, Depakote is a fairly effective drug in the prevention and
treatment of bipolar disorders.  Depakote was prescribed for O.C., but he did
not think he had a mental illness and would not take it.  O.C. told Dr. Tipton
that the medicine had bad side effects on him.  The record shows, however, that
he did use marihuana on an almost daily basis.

At
the time of the first commitment to Kerrville State Hospital, O.C. was
complaining that his girlfriend (April) would not let him see his ten‑month‑old
son (A.H.) and that she was involved with other men.  He was threatening to
kill himself and had actually cut his wrist with a hunting knife so that he
could feel the pain.  O.C. was committed because he was a danger to himself or
others.

The
2002 commitment was under an order for emergency detention.  O.C. said that he
was wanting to kill himself and others; he said that he would kill anyone who
made him mad.

Eddie
Lynn Weaver, a CPS caseworker, had been working with O.C. and April since
June 15, 2007.  O.C. told Weaver, AI
will get you if they take my children.@ 
O.C. had also made the comment to another counselor that, if they terminated
his parental rights, he would pick up a gun and start shooting people.

According
to records reviewed by Dr. Tipton, O.C. had a history of state hospital
admissions dating back to 1973.  Dr. Tipton=s
opinion was that O.C.=s
condition would not get any better and that there would be no recovery in the
next fifteen years (after the youngest child was over eighteen) that would
enable him to parent the children.  Dr. Tipton=s
opinion was that O.C.=s
mental disease, emotional illness, or mental deficiency would render him unable
to provide for the physical, emotional, and mental needs of his children and
that it would be in the best interest of the children to terminate his parental
rights.  He cannot successfully parent.

The
Department also presented testimony through Ray Russell, an officer with the
Eastland Police Department; Jimmy Don Brooks, a deputy sheriff with the
Eastland County Sheriff=s
Department; and Scott McDade, an officer with the Cisco Police Department. 
Michael West, an officer with the Cisco Police Department, and Matthew Scurry,
another officer with the Cisco Police Department, testified in a prior hearing
in this case.  Their testimony in that hearing was admitted into evidence in
this last hearing.








The
testimony of these officers reveals their regular involvement in the rather
stormy nine years that O.C. and April had been together off and on.  The
officers had been called to the parties=
residences many, many times during O.C. and April=s
relationship.  Officer Russell testified, A[E]very
time they get together, we get a call.@ 
They had been dealing with O.C. and April for two or three years, and things
had not changed.  Cisco police had responded to over ten calls during the
period from January 2007 to July 24, 2007.

The
family disputes that precipitated the calls to law enforcement generally
involved threats, shouting, yelling, cursing each other and the officers,
suicide threats by O.C., assaults by O.C. on April and her boyfriend B Michael Foster, and other
acts that caused Aan
ongoing violent relationship,@
Aa pretty dangerous
environment.@  O.C.
displayed a knife during some of these instances, threatening to use it on
himself or others.  O.C. had told Officer Scurry that he would kill himself by
sticking a knife in his chest or would walk out into I‑20 traffic.  He
told Officer West that he had thought about shooting himself.  The children
were present during some of these altercations. 

Several
of the witnesses B
including April, Vicki Copeland (one of O.C. and April=s counselors), and Weaver B provided evidence of O.C.=s aggressive anger
management problem.  He had been receiving anger management services off and on
for twenty years.  One of Weaver=s
main concerns with O.C. was Ahis
aggressive anger, his outbursts, impulsive reactions.@  April acknowledged that she is the one that
most often knew how to and did Arile
up O.C.=s temper.@  According to Betty
Meiron, a person who, pursuant to court order, provided counseling services to
O.C. and April, O.C. would make some progress and then April would Apush his buttons or do
something or another and it was back to step one.@ 
Meiron also said that O.C. would never be able to parent the children
successfully, but she thought that O.C. alone would be better than these
parents together.  When O.C. and April are together, it is Alike, I guess, throwing a
fire in a gasoline can.@

Meiron
also testified regarding April=s
counseling.  When asked about April=s
response to counseling, Meiron said that April was not interested.  AShe was more concerned with
herself than she was with her children.@ 
April was not always where she was to be when she was to be.  She was sick
three or four times and in bed two or three times when Meiron was to have a
session with her.  AShe
didn=t really like to
follow through on most of the things I suggested.@








At
the time of the final hearing in this case, April was on community supervision
for two instances of debit card abuse committed on July 8, 2007, and July 10,
2007.  On January 28, 2008, the trial court amended her conditions of community
supervision to require her to stay away from O.C.  O.C. made bond when he was
arrested for assaulting April.  According to a document filed with the County
Clerk of Eastland County on January 25, 2008, the county court imposed a
condition in that bond and required O.C. to refrain from communicating with or
going around April.  On February 5, 2008, the 91st District Court entered a
temporary restraining order basically, among other things, requiring the
parties to stay away from each other, not to communicate with each other, and
not to threaten each other.

On
July 16, 2007, O.C. and April were married and were living together at the time
of the hearing the subject of this appeal.  This case had been set originally
for June 26, 2007, but it was reset to July 24, 2007, so that further
social studies could be completed.  It was during this period of time that O.C.
and April were married.

On
the night before the July 24 hearing, at 6:00 p.m., Officer West and Officer
Scurry were called to the place where O.C. and April lived.  April had called
for them.  When they arrived there, O.C. and April were in the middle of the
road.  April stayed in the road, but O.C. started going toward the house; he
had a knife in his hand and went inside.  He had taken eleven Lexapro pills, an
anti­depressant.  They were called out again at 9:00 p.m.  Officer Scurry
testified at the July 24, 2007 hearing that O.C. was calm at this time, but
April was A[i]rritated,
upset, almost out of control.@ 
She was yelling and screaming and wanted O.C. committed.  Within the month
before the July 24, 2007 hearing, Officer Scurry said that he had been
requested to go to the house Aprobably
a half dozen times.@ 
The children did not witness these events because they had been removed by the
Department on June 12, 2007.

April
testified at the trial.  She was twenty‑seven years old at the time of
the trial.  April agreed that she knew how to, and did, Apush [O.C.=s]
buttons.@  However,
she now knows that she can just walk away and give him Aa cooling-off period.@  It was her plan to continue to live with
O.C. in Cisco.

April
had two other partners during the some nine years she and O.C. were together. 
She was with one of these partners, Simon Soto, for one and one‑half
years.  April and Soto did Aice@ and marihuana together
during this time.  Although the children lived with April and Soto, she never
did drugs while they were there B
they were with O.C. at those times.  The older child was five years old at this
time; the younger child was two.  Soto was indicted for, and later pleaded
guilty to, causing April bodily injury; he broke her hand when he assaulted her
on July 18, 2006.  The last Acouple
of months@ they were
together, Ait got real
bad and [April] left him.@

April=s other partner during this
time was Michael Foster.  She and Foster were together for two or three weeks
in February 2008.  She testified that this was during the time that she was to
be receiving services on parenting and the children were in foster care.  She
left because Foster was abusive; he broke her nose.








April
testified to two other assaults during the time that her children were in
foster care.  One of these involved a fight between O.C. and Foster on April 7
or 8, 2008.  The other incident occurred in January 2008 when O.C. assaulted
April at the place where they both worked. April also testified that she had
pleaded guilty to two charges of debit card abuse involving the misuse of a
customer=s debit card
at a Fina station where she worked and that the children had been in foster
care for less than one month when she committed these offenses.  April also
acknowledged that she and O.C. had gotten into a fight the night before this
case was set for hearing the first time.

Regarding
her efforts in counseling, the Department had arranged for an additional eight
sessions of counseling for April, but she only went to one.  April=s testimony is that,
although she had the cognitive ability to learn how to be a good parent, she
did not assert any effort to be a good parent, that she chose not to make a
difference in her life, and that she had endangered her children.           The
following exchange occurred during the Department=s
cross‑examination of April:

Q. 
So, would you agree with me that you have knowingly placed or knowingly allowed
your children to remain in conditions or surroundings that endanger their
physical or emotional well‑being?

 

A. 
Yes.

 

Q. 
Do you agree with me that you have engaged in conduct or knowingly placed your
children with persons who have engaged in conduct that endangers their physical
or emotional well‑being?

 

A. 
Yes.

 

Q. 
Do you agree with me that you have failed to comply with the provisions of a
court order, your service plan that specifically establish the actions that you
need to take --

 

A. 
Yes.

 

Q. 
-- to have your children returned to you? Do you agree with me that you have
done that?

 

A. 
Yes.

 








Officer
Russell testified that, based upon his investigation, both O.C. and April
knowingly engaged in conduct or with persons who endangered the physical health
or emotional well‑being of the children.  He also had the opinion that
they both knowingly placed or allowed the children to remain in conditions or
surroundings that endangered the children=s
physical or emotional well‑being.  He also told the court that he thought
that it would be in the children=s
best interest to terminate O.C.=s
and April=s parental
rights.  Deputy Brooks told the trial court the same things.

CPS
Investigator Kristi Ann Rose also testified to those things, as did Weaver. 
The children had been placed with the Department under Tex. Fam. Code Ann. ch. 262 (Vernon 2008) because of O.C.=s and April=s negligence and abuse. 
Weaver testified that April failed to comply with the court order that provided
for the return of the children.  Weaver=s
opinion also was that O.C.=s
mental disease or deficiency, disability, substantially prevented him, in all
reasonable probability, from parenting the children into adulthood.  Also,
Rebecca McCrary, a CASA volunteer and the guardian ad litem for the children,
shared the opinions of Officer Russell, Deputy Brooks, Rose, and Weaver.  April
was the only witness to testify that it would not be in the best interest of
the children to terminate her parental rights as well as O.C.=s parental rights.

Weaver
told the trial court that April had lived in five different places since the
first of 2008.  The older child had been in six different schools in eight
months when the Department started this case.  When the Department took over
the care of the older child, he cursed at his caregiver, spit on the caregiver,
and had to be removed from one home.  After he had been for a visit, he
returned out of control, angry, throwing things, and hitting people; would not
listen to discipline; and was Avery
out of control.@  Rose
testified that the older child could use the words Am----------r, the >F=
word, b---h,@ and
other curse words Afluently
. . . because he had heard them.@ 
He had been removed from the home on one other occasion when he was two years
old.  Meiron testified that the older child held a real resentment toward April
and that he had said that he wished that O.C. would die.  As of the date of the
hearing, after he had been in foster care, the older child=s grades were good, he was
more in control of his emotions, and he was very protective of his sister. 
Unlike his behavior before foster care, he was listening to adults and their
direction.

The
younger child also improved while in foster care, according to Weaver. 
Previously, she had not been as hard to control as her older brother, but she
was Aa little bit@ unmanageable.  She could
be hard to redirect.  Now, she has all ASs@ in school.  Weaver said
that now she was calm and could be managed, controlled, Aa lady.@ 
As to both of the children, Weaver said that A[t]hey=re just good kids.@








After
a review of this evidence in accordance with the well‑established
standards of review that we set out earlier in this opinion, we hold that the
evidence is both legally and factually sufficient to support the judgment of
the trial court.  April=s
four issues on appeal are overruled.

The
judgment of the trial court is affirmed.

 

 

PER CURIAM

 

April 16, 2009

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.