**Opinion filed April 16, 2009**



In The

# Eleventh Court of Appeals

_____

## No. 11-08-00216-CV

_____

## IN THE INTEREST OF A.H. AND A.H., CHILDREN

**On Appeal from the 91st District Court**

**Eastland County, Texas**

**Trial Court Cause No. CV-07-40841**

### M E M O R A N D U M   O P I N I O N

After some years of supervision by the Department of Family and Protective Services, the trial court terminated the parental rights of O.C. Hill Jr. and April Larance Hill to A.H., their eight-year-old son, and A.H., their four-year-old daughter. The trial court then appointed the Department as the permanent managing conservator. We affirm.

O.C. raises four issues in this appeal. In his first issue, O.C. complains that the Department failed to meet its burden to prove that he knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being. He also claims that the Department failed to prove that he engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being. O.C.'s second issue relates to the trial court's action in allowing various witnesses to testify as experts when they had not been qualified as such. In Issue Three, O.C. complains that the trial court erred when it allowed the Department to withdraw that portion of its pleadings regarding

alternative placement of the children. Finally, in Issue Four, O.C. maintains that he was denied effective assistance of counsel because trial counsel did not present any witnesses to show his "appropriateness as a parent."

At the outset, we must address the Department's position that O.C. did not file a statement of points on appeal as required under the provisions of TEX. FAM. CODE ANN. § 263.405 (Vernon 2008). That section, in subdivision (b), contains language under the terms of which a party who intends to appeal a final order of a trial court in a termination suit must file a statement of the point or points on which the party intends to appeal. The statement may be combined with a notice of appeal. An appellate court is prohibited from considering any points on appeal that have not been set forth in the statement of points on appeal. Section 263.405(i). It is not sufficient to claim only that the decision is contrary to the evidence or that the evidence is legally or factually insufficient; such claims do not preserve an issue for appeal. *Id.*

O.C. was required to file his statement of points on appeal by July 1, 2008; he did not file it until July 7, 2008. This same date, he also filed a motion for extension of time to file the statement of points on appeal. However, he did not obtain a ruling on that motion.

O.C. did file a notice of appeal. In the relevant portion of that notice of appeal, O.C. states:

> O.C. Hill desires to appeal from the ruling terminating his parental rights. The State did not meet its burden to support such termination. O.C. Hill completed all services and tasks requested by the State. He has never harmed the children, they were clean and well fed, and he maintained a residence suitable for the children to reside.

We hold that the statements in O.C.'s notice of appeal are in the nature of those proclaimed to be insufficient in Section 263.405(i), and we are prohibited from considering his issues on appeal. *See In re K.C.B.*, 251 S.W.3d 514, 515 (Tex. 2008).

Furthermore, in the statements contained in the notice of appeal, O.C. does not address the alleged error of the trial court regarding expert witnesses, the abandonment of the alternative placement theories originally alleged by the Department, or the claim regarding effective representation by counsel. Even if he had, O.C. made no objections regarding the qualifications of the witnesses about whom he complains, and he has waived any error in that regard. TEX. R. APP. P. 33.1(a). Likewise, O.C. did not object (assuming he could have) to the Department's abandonment of the alternative placement portion in its pleadings and has waived any objection he

2

might have had. *Id.* Additionally, we do not know what the content of any witness testimony might have been if O.C.'s lawyer had called any witnesses. TEX. R. APP. P. 33. Because we may not consider them, we overrule all of O.C.'s issues on appeal.

In its Order of Termination, the trial court found that April had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children, that she had engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children, and that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from the parent for the abuse or neglect of the children. These are all findings that will support termination if the evidence is legally and factually sufficient to support the findings. TEX. FAM. CODE ANN. § 161.001(1)(D), (E), (O) (Vernon 2008). Additionally, the termination must be in the best interest of the children as the trial court also found. TEX. FAM. CODE ANN. § 161.001(2) (Vernon 2008). In four issues, April contends that the evidence is both legally and factually insufficient to support those findings.

Texas courts have long recognized that the natural right existing between a parent and child is of "constitutional dimensions." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). There is a strong presumption that the best interest of a child is served by keeping the child with the natural parent. *In re G.M.*, 596 S.W.2d 846 (Tex. 1980). Thus, involuntary termination proceedings and statutes are strictly scrutinized in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20-21 (Tex. 1985).

Due process requires that the grounds for termination be established by clear and convincing evidence. This requires that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (Vernon 2008); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994).

When conducting a legal sufficiency review, we review the entire record in the light most favorable to the finding and determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the trial court resolved disputed facts in favor of its finding. *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 149 S.W.3d 814, 817 (Tex. App.—Eastland 2004, no pet.). We

must also disregard all evidence that a reasonable factfinder could have disbelieved or found incredible, but we cannot disregard undisputed facts. *In re J.F.C.*, 96 S.W.3d at 266.

When conducting a factual sufficiency review, we give due consideration to the evidence the trial court could reasonably have found to be true. *In re J.F.C.*, 96 S.W.3d at 266. We must determine whether the evidence is such that the trial court could reasonably have formed a firm belief or conviction regarding the allegations. *Id.* We must also consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* While we do not view the evidence in the light most favorable to the challenged finding, our review must maintain the respective roles of trial courts and appellate courts. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). If, in light of the entire record, the disputed evidence establishes that a reasonable factfinder could not have formed a firm belief or conviction in favor of the finding, then the evidence is factually insufficient. *In re J.F.C.*, 96 S.W.3d at 266.

In addressing April's issues on appeal, it is necessary to review testimony relating to both parents.

Dr. George Tipton, a psychiatrist employed by the Center for Life Resources (the global Mental Health/Mental Retardation Center in Brownwood), saw O.C. for psychological and psychiatric evaluations four times in 2005 and one time in 2007. He also reviewed the records from two previous hospitalizations under commitment to Kerrville State Hospital. The first commitment was in 2001; the last commitment was in 2002.

Dr. Tipton's diagnosis of O.C., based upon his sessions with O.C. and the records that he reviewed, was "bipolar with psychotic features." O.C. also suffered from an antisocial personality. Dr. Tipton explained that bipolar disorder was a psychiatric condition dealing with mood lability. It evidences itself by episodes of mania – "agitation, rapid speech, continuous movement, inability to sleep, angry outbursts, irritability" – alternating with periods of depression – "unhappy mood, thoughts that are derogatory of yourself, inability to sleep, poor appetite, weight loss." Dr. Tipton also explained that the term "antisocial personality" was "a description of an individual's behavior and that an antisocial diagnosis would indicate that [O.C.] would tend not to follow the rules of society."

According to Dr. Tipton, Depakote is a fairly effective drug in the prevention and treatment of bipolar disorders. Depakote was prescribed for O.C., but he did not think he had a mental illness

4

and would not take it. O.C. told Dr. Tipton that the medicine had bad side effects on him. The record shows, however, that he did use marihuana on an almost daily basis.

At the time of the first commitment to Kerrville State Hospital, O.C. was complaining that his girlfriend (April) would not let him see his ten-month-old son (A.H.) and that she was involved with other men. He was threatening to kill himself and had actually cut his wrist with a hunting knife so that he could feel the pain. O.C. was committed because he was a danger to himself or others.

The 2002 commitment was under an order for emergency detention. O.C. said that he was wanting to kill himself and others; he said that he would kill anyone who made him mad.

Eddie Lynn Weaver, a CPS caseworker, had been working with O.C. and April since June 15, 2007. O.C. told Weaver, "I will get you if they take my children." O.C. had also made the comment to another counselor that, if they terminated his parental rights, he would pick up a gun and start shooting people.

According to records reviewed by Dr. Tipton, O.C. had a history of state hospital admissions dating back to 1973. Dr. Tipton's opinion was that O.C.'s condition would not get any better and that there would be no recovery in the next fifteen years (after the youngest child was over eighteen) that would enable him to parent the children. Dr. Tipton's opinion was that O.C.'s mental disease, emotional illness, or mental deficiency would render him unable to provide for the physical, emotional, and mental needs of his children and that it would be in the best interest of the children to terminate his parental rights. He cannot successfully parent.

The Department also presented testimony through Ray Russell, an officer with the Eastland Police Department; Jimmy Don Brooks, a deputy sheriff with the Eastland County Sheriff's Department; and Scott McDade, an officer with the Cisco Police Department. Michael West, an officer with the Cisco Police Department, and Matthew Scurry, another officer with the Cisco Police Department, testified in a prior hearing in this case. Their testimony in that hearing was admitted into evidence in this last hearing.

The testimony of these officers reveals their regular involvement in the rather stormy nine years that O.C. and April had been together off and on. The officers had been called to the parties' residences many, many times during O.C. and April's relationship. Officer Russell testified, "[E]very time they get together, we get a call." They had been dealing with O.C. and April for two

or three years, and things had not changed. Cisco police had responded to over ten calls during the period from January 2007 to July 24, 2007.

The family disputes that precipitated the calls to law enforcement generally involved threats, shouting, yelling, cursing each other and the officers, suicide threats by O.C., assaults by O.C. on April and her boyfriend – Michael Foster, and other acts that caused "an ongoing violent relationship," "a pretty dangerous environment." O.C. displayed a knife during some of these instances, threatening to use it on himself or others. O.C. had told Officer Scurry that he would kill himself by sticking a knife in his chest or would walk out into I-20 traffic. He told Officer West that he had thought about shooting himself. The children were present during some of these altercations.

Several of the witnesses – including April, Vicki Copeland (one of O.C. and April's counselors), and Weaver – provided evidence of O.C.'s aggressive anger management problem. He had been receiving anger management services off and on for twenty years. One of Weaver's main concerns with O.C. was "his aggressive anger, his outbursts, impulsive reactions." April acknowledged that she is the one that most often knew how to and did "rile up O.C.'s temper." According to Betty Meiron, a person who, pursuant to court order, provided counseling services to O.C. and April, O.C. would make some progress and then April would "push his buttons or do something or another and it was back to step one." Meiron also said that O.C. would never be able to parent the children successfully, but she thought that O.C. alone would be better than these parents together. When O.C. and April are together, it is "like, I guess, throwing a fire in a gasoline can."

Meiron also testified regarding April's counseling. When asked about April's response to counseling, Meiron said that April was not interested. "She was more concerned with herself than she was with her children." April was not always where she was to be when she was to be. She was sick three or four times and in bed two or three times when Meiron was to have a session with her. "She didn't really like to follow through on most of the things I suggested."

At the time of the final hearing in this case, April was on community supervision for two instances of debit card abuse committed on July 8, 2007, and July 10, 2007. On January 28, 2008, the trial court amended her conditions of community supervision to require her to stay away from O.C. O.C. made bond when he was arrested for assaulting April. According to a document filed with the County Clerk of Eastland County on January 25, 2008, the county court imposed a condition in that bond and required O.C. to refrain from communicating with or going around April. On February 5, 2008, the 91st District Court entered a temporary restraining order basically, among

6

other things, requiring the parties to stay away from each other, not to communicate with each other, and not to threaten each other.

On July 16, 2007, O.C. and April were married and were living together at the time of the hearing the subject of this appeal. This case had been set originally for June 26, 2007, but it was reset to July 24, 2007, so that further social studies could be completed. It was during this period of time that O.C. and April were married.

On the night before the July 24 hearing, at 6:00 p.m., Officer West and Officer Scurry were called to the place where O.C. and April lived. April had called for them. When they arrived there, O.C. and April were in the middle of the road. April stayed in the road, but O.C. started going toward the house; he had a knife in his hand and went inside. He had taken eleven Lexapro pills, an antidepressant. They were called out again at 9:00 p.m. Officer Scurry testified at the July 24, 2007 hearing that O.C. was calm at this time, but April was "[i]rritated, upset, almost out of control." She was yelling and screaming and wanted O.C. committed. Within the month before the July 24, 2007 hearing, Officer Scurry said that he had been requested to go to the house "probably a half dozen times." The children did not witness these events because they had been removed by the Department on June 12, 2007.

April testified at the trial. She was twenty-seven years old at the time of the trial. April agreed that she knew how to, and did, "push [O.C.'s] buttons." However, she now knows that she can just walk away and give him "a cooling-off period." It was her plan to continue to live with O.C. in Cisco.

April had two other partners during the some nine years she and O.C. were together. She was with one of these partners, Simon Soto, for one and one-half years. April and Soto did "ice" and marihuana together during this time. Although the children lived with April and Soto, she never did drugs while they were there – they were with O.C. at those times. The older child was five years old at this time; the younger child was two. Soto was indicted for, and later pleaded guilty to, causing April bodily injury; he broke her hand when he assaulted her on July 18, 2006. The last "couple of months" they were together, "it got real bad and [April] left him."

April's other partner during this time was Michael Foster. She and Foster were together for two or three weeks in February 2008. She testified that this was during the time that she was to be receiving services on parenting and the children were in foster care. She left because Foster was abusive; he broke her nose.

7

April testified to two other assaults during the time that her children were in foster care. One of these involved a fight between O.C. and Foster on April 7 or 8, 2008. The other incident occurred in January 2008 when O.C. assaulted April at the place where they both worked. April also testified that she had pleaded guilty to two charges of debit card abuse involving the misuse of a customer's debit card at a Fina station where she worked and that the children had been in foster care for less than one month when she committed these offenses. April also acknowledged that she and O.C. had gotten into a fight the night before this case was set for hearing the first time.

Regarding her efforts in counseling, the Department had arranged for an additional eight sessions of counseling for April, but she only went to one. April's testimony is that, although she had the cognitive ability to learn how to be a good parent, she did not assert any effort to be a good parent, that she chose not to make a difference in her life, and that she had endangered her children.

The following exchange occurred during the Department's cross-examination of April:

> Q. So, would you agree with me that you have knowingly placed or knowingly allowed your children to remain in conditions or surroundings that endanger their physical or emotional well-being?
>
> A. Yes.
>
> Q. Do you agree with me that you have engaged in conduct or knowingly placed your children with persons who have engaged in conduct that endangers their physical or emotional well-being?
>
> A. Yes.
>
> Q. Do you agree with me that you have failed to comply with the provisions of a court order, your service plan that specifically establish the actions that you need to take --
>
> A. Yes.
>
> Q. -- to have your children returned to you? Do you agree with me that you have done that?
>
> A. Yes.

Officer Russell testified that, based upon his investigation, both O.C. and April knowingly engaged in conduct or with persons who endangered the physical health or emotional well-being of the children. He also had the opinion that they both knowingly placed or allowed the children to

remain in conditions or surroundings that endangered the children's physical or emotional well-being. He also told the court that he thought that it would be in the children's best interest to terminate O.C.'s and April's parental rights. Deputy Brooks told the trial court the same things.

CPS Investigator Kristi Ann Rose also testified to those things, as did Weaver. The children had been placed with the Department under TEX. FAM. CODE ANN. ch. 262 (Vernon 2008) because of O.C.'s and April's negligence and abuse. Weaver testified that April failed to comply with the court order that provided for the return of the children. Weaver's opinion also was that O.C.'s mental disease or deficiency, disability, substantially prevented him, in all reasonable probability, from parenting the children into adulthood. Also, Rebecca McCrary, a CASA volunteer and the guardian ad litem for the children, shared the opinions of Officer Russell, Deputy Brooks, Rose, and Weaver. April was the only witness to testify that it would not be in the best interest of the children to terminate her parental rights as well as O.C.'s parental rights.

Weaver told the trial court that April had lived in five different places since the first of 2008. The older child had been in six different schools in eight months when the Department started this case. When the Department took over the care of the older child, he cursed at his caregiver, spit on the caregiver, and had to be removed from one home. After he had been for a visit, he returned out of control, angry, throwing things, and hitting people; would not listen to discipline; and was "very out of control." Rose testified that the older child could use the words "m----------r, the 'F' word, b---h," and other curse words "fluently . . . because he had heard them." He had been removed from the home on one other occasion when he was two years old. Meiron testified that the older child held a real resentment toward April and that he had said that he wished that O.C. would die. As of the date of the hearing, after he had been in foster care, the older child's grades were good, he was more in control of his emotions, and he was very protective of his sister. Unlike his behavior before foster care, he was listening to adults and their direction.

The younger child also improved while in foster care, according to Weaver. Previously, she had not been as hard to control as her older brother, but she was "a little bit" unmanageable. She could be hard to redirect. Now, she has all "*S*s" in school. Weaver said that now she was calm and could be managed, controlled, "a lady." As to both of the children, Weaver said that "[t]hey're just good kids."

9

After a review of this evidence in accordance with the well-established standards of review that we set out earlier in this opinion, we hold that the evidence is both legally and factually sufficient to support the judgment of the trial court. April's four issues on appeal are overruled.

The judgment of the trial court is affirmed.

PER CURIAM

April 16, 2009

Panel consists of:  Wright, C.J.,
McCall, J., and Strange, J.