**Opinion filed October 21, 2010**



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00362-CV

_____

## IN THE INTEREST OF D.W.W.D. & M.L.B.M., CHILDREN

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CV 08-09-293**

### M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from a trial court's order terminating appellants' parental rights. We affirm.

### I. *Background Facts*

Virgie DeLisle and Michael Massey are the biological parents of D.W.W.D. and M.L.B.M. DeLisle is married to Timothy DeLisle, but the two are separated. At the beginning of this case, DeLisle, Massey, and the children lived with DeLisle's mother, Kitty Carlisle.

On August 29, 2008, DeLisle and Carlisle took DeLisle's one-month-old daughter, M.L.B.M., to Brownwood Regional Medical Center. When admitted, the infant weighed less than her birth weight. Staff determined that the parents had not been mixing the formula correctly. The hospital filed a report with the Texas Department of Family and Protective Services.

The Department's investigation uncovered further causes for concern. In addition to difficulties mixing the formula, the Department was concerned that the parents were using tap water in the formula and that DeLisle, Massey, and Carlisle had taken M.L.B.M. to swim in Lake Brownwood while the umbilical cord was still attached to her navel, thereby exposing the infant to a risk of infection. A visit to their home revealed it to be filthy. Twenty-one month old D.W.W.D was not verbal and had head lice. DeLisle, Massey, and Carlisle appeared to the Department's investigator to be cognitively impaired, a fact psychiatric evaluations later confirmed. The Department removed the children from the home and eventually sought the termination of DeLisle's and Massey's parental rights.

A jury trial was held in October 2009, with the jury finding by clear and convincing evidence that the parental rights of DeLisle and Massey should be terminated.

## II. *Issues*

On appeal, DeLisle and Massey argue that the evidence was legally and factually insufficient to support the jury verdict terminating their parental rights. DeLisle also argues that she was unduly prejudiced by the Department's excessive use of leading questions in the direct examination of LVN Angie Willett.

## III. *Legal and Factual Insufficiency*

### A. *Standard of Review.*

The natural right existing between a parent and a child is of "constitutional dimensions." *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). There is a strong presumption that it is in the child's best interest to remain with the natural parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Grounds for termination must be established by clear and convincing evidence. This requires a degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (Vernon 2008).

In a legal sufficiency review, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In doing so, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*.

2

In a factual sufficiency review, we must give due consideration to evidence that the trier of fact could reasonably have found to be clear and convincing. *Id.* We must determine whether the evidence is such that the factfinder could reasonably have formed a firm belief or conviction regarding the allegations. *Id.* We must also consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.* To determine if the evidence is factually sufficient, we give due deference to the trial court's findings and determine whether, on the entire record, the trial court could reasonably form a firm conviction or belief that the parent committed an act that would support termination and that termination of the parent's parental rights would be in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

Only one ground of termination is necessary for a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

*B. Grounds for Termination.*

In its verdict, the jury found four statutory grounds for the termination of parental rights:

(1) that the parent had knowingly placed or allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children. TEX. FAM. CODE ANN. § 161.001(1)(D) (Vernon Supp. 2010).

(2) that the parent had engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. Section 161.001(1)(E).

(3) that the parent had failed to comply with provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent as a result of the abuse or neglect of the children. Section 161.001(1)(O).

(4) that the parent had a mental or emotional illness or a mental deficiency that renders them unable to provide for the physical, emotional, and mental needs of the children and will continue to render the parent unable to provide for the children's needs until the 18th birthday of the children, despite at least six months of reasonable efforts to return the children to the parent. Section 161.003(a).

Section 161.001(1)(E) of the Texas Family Code requires clear and convincing proof that the parent "engaged in conduct or knowingly placed the child with persons who engaged in

conduct which endangers the physical or emotional well-being of the child." This section refers not only to the parent's acts, but also to the parent's omissions or failures to act. *In re J.A.*, 109 S.W.3d 869, 875 (Tex. App.—Dallas 2003, pet. denied). Endanger means "to expose to loss or injury; to jeopardize." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). Although endanger means more than a threat of physical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Id.* The Department need not establish the specific danger to the child's well-being as an independent proposition; the danger may be inferred from parental misconduct. *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 149 S.W.3d 814, 817 (Tex. App.—Eastland 2004, no pet.).

At the time in question, DeLisle and the children had been staying at Carlisle's house in Blanket, Texas. Also staying there was Carlisle's elderly boyfriend Clarence Wachoviak. For the first few months of D.W.W.D.'s life, DeLisle and her husband Timothy had lived together. When Timothy discovered that Massey was the father of D.W.W.D., he and DeLisle separated. After the separation, Timothy and Carlisle began a sexual relationship.

Massey moved into the home. At trial, DeLisle testified that she had concerns about how Massey disciplined the children but refused to go into specifics. She also did not think that he provided for them financially. Periodically, DeLisle and Carlisle would kick Massey out, and he would return to his mother's house in Bangs, Texas.

Whenever Massey was not there, Timothy would return to Carlisle's house. Timothy was physically abusive toward DeLisle and Carlisle. At trial, DeLisle also testified that Timothy had been violent toward the children. Carlisle testified that Timothy is not someone the children should be around. Nevertheless, there was evidence that both DeLisle and Carlisle remained in contact with Timothy up to the date of trial.

Child Protective Services became involved in this case when M.L.B.M. was hospitalized a month after she was born for failure to thrive. When admitted to the hospital, she weighed four ounces less than her birth weight. Angie Willett, a nurse who had treated M.L.B.M. and who had worked at the pediatric department of the Brownwood Regional Medical Center for six years, testified that M.L.B.M. was the thinnest failure-to-thrive patient she had seen. It was determined that the parents were not making the formula strong enough. In addition, doctors were concerned that DeLisle's use of hot tap water to mix the formula was exposing the infant to

4

chemicals from the water heater. DeLisle also admitted that she, Massey, and Carlisle had taken M.L.B.M. swimming in Lake Brownwood while the infant's umbilical cord was still attached, thus risking infection.

While DeLisle and Carlisle were at the hospital with M.L.B.M., Massey and Wachoviak looked after D.W.W.D. When a C.P.S. investigator visited the house, the place was filthy. D.W.W.D. appeared dirty and had a bad case of head lice. Even though their pediatrician had told DeLisle and Massey that the only way to treat the lice was to cut D.W.W.D.'s hair short, Massey had refused to let anyone do so. D.W.W.D. appeared to be developmentally delayed. When CPS removed D.W.W.D. from the home a few days later, he was wearing an outfit that was too small and a urine-soaked diaper filled with feces.

These facts are sufficient to allow a reasonable juror to form a firm conviction that DeLisle and Massey engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. Therefore, the evidence is legally and factually sufficient to establish grounds for termination under Section 161.001(1)(E) of the Texas Family Code. Because only one ground is needed to support a termination order, it is unnecessary to discuss the remaining statutory findings.

*C. Best Interests of the Children.*

To terminate the parent-child relationship, the trial court must also find that termination is in the best interest of the children. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531 533 (Tex. 1987). When reviewing the sufficiency of the best-interest evidence, we apply the nonexclusive factors found in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors include (1) the desires of the children, (2) the emotional and physical needs of the children now and in the future, (3) the emotional and physical danger to the children now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the children, (6) the plans for the children by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parents. *Id.* The Department need not prove all of these factors. *In re C.H.*, 89 S.W.3d at 27. In an appropriate case, proof of just one factor may be sufficient. *Id.*

After removal, CPS prepared a family service plan. Among the tasks required were that DeLisle and Carlisle participate in individual counseling, undergo a psychiatric assessment, attend family counseling, and attend parenting classes.

A psychological evaluation of DeLisle stated that she was "in the mildly retarded range of intelligence with limited cognitive skills to recognize, understand and develop appropriate parenting strategies." At trial, Kay Oliver, DeLisle's CPS therapist, stated that she did not believe that DeLisle had the mental capacity to care for D.W.W.D. and M.L.B.M. and that DeLisle's condition would not improve. She testified:

> [W]hat I was seeing was lack of an ability to take care of herself, lack of ability to maintain employment, lack of ability to provide adequate child care. For example, with the self-care thing, she told me she had not brushed her teeth since she was five years old, and she was living with her mother, did not have any means of support was totally dependent on her mother to bring her to the sessions for transportation, for a place to live. I believe she may have been drawing food stamps on her own, but she had no income of her own.

In addition, Oliver had concerns about things DeLisle would say about parenting. When discussing CPS's concerns about how DeLisle mixed M.L.B.M.'s formula, DeLisle became very upset and said that "[s]he didn't think a child should be pussy-fed, that they need to learn to take up for themselves." There were also concerns about whether DeLisle would be able to put the children's needs ahead of her own. Oliver testified that DeLisle would talk about not having enough money for food, gasoline, or basic furniture but would show up to sessions with sculptured nails.

Oliver recalled that DeLisle's relationships with Massey and Timothy changed frequently throughout the course of her counseling, with DeLisle one week intending to reconcile with Timothy and the next week intending to move in with Massey. Although DeLisle relied on Carlisle for everything, Oliver testified that their relationship was unstable as well. They had problems getting along, and DeLisle talked about being abused by her mother as a child. Oliver was of the opinion that the kids should not be placed with DeLisle.

Shay Martin, a Department caseworker, testified that there was some improvement in the parents' interactions during visits with the children after the Department switched to giving DeLisle and Massey thirty minutes with each child separately rather than an hour with both children at the same time. However, after this initial improvement the interactions remained at the same level.

In the time since CPS removed the children, DeLisle has qualified to receive SSI payments. She moved out of her mother's house and into a trailer park. After a month, she found she could not afford to live there and moved into a camper trailer near a friend's house. DeLisle admitted that the camper trailer would be too small for her and her two children. If she gets her children back, she hoped to be able to move into government housing.

Von Bates, a counselor at the Family Services Center, testified that DeLisle had made some progress in becoming more independent but admitted that this progress had been slow. DeLisle still depended on someone else for transportation, and providing for her children would be a struggle. Bates testified that she thought that DeLisle could provide for the physical, mental, and emotional needs of the children to the best of her ability. However, Bates based this opinion on her belief that DeLisle was providing for those needs before the children's removal.

Gina Jameson, DeLisle's parenting instructor, testified that she believed that DeLisle could successfully parent the children with the right support system of ongoing parenting classes, support from the family service center, a good pediatrician, and stability in her life.

A psychological evaluation of Massey said that he was "in the mildly retarded range of intelligence, with limited cognitive skills to recognize, understand and develop appropriate parenting strategies." Dr. Bill Gustavus, Massey's CPS therapist, testified that Massey would have difficulty making independent decisions.

> Michael will be challenged by making decisions about their welfare, about what they need to eat, about the amount of nurturance that they need, about who is safe to play with, about where they - - lots of decision. And, those basic decisions that you and I take for granted, and that most people perform not perfectly, but to an acceptable degree, are going to be very challenging areas for [Michael].

In the time since CPS removed the children, Massey qualified to receive SSI payments. Massey moved into a house in Brownwood with a roommate. Just before trial, his roommate moved out. When asked what he would do now, Massey said he would pay the rent by himself. Dr. Gustavus doubted that Massey can afford to do so.

While in foster care, D.W.W.D. underwent surgery to have tubes put into his ears. Since then, his verbal abilities have improved. M.L.B.M. has a chromosomal defect inherited from DeLisle and Carlisle. DeLisle herself questioned whether she and Massey would have the money or mental abilities to care for the children. She agreed that the foster parents were taking good care of them and that the kids are mixed up now with two sets of parents.

7

The evidence is legally and factually sufficient for a reasonable juror to form a firm conviction that termination of DeLisle's and Massey's parental rights would be in the best interests of D.W.W.D. and M.L.B.M. Accordingly, we overrule DeLisle's and Massey's sufficiency of the evidence points.

## IV. *Leading Questions*

During direct examination of LVN Angie Willett, DeLisle's counsel objected three times to leading questions. The trial court overruled the second objection. The witness's testimony on direct concerned the diagnosis M.L.B.M. received when admitted to the hospital, the appearance of the infant, the manner in which the hospital treated the infant, and her impressions of DeLisle and Carlisle.

On direct examination, leading questions should be used only when necessary to develop a witness's testimony. TEX. R. EVID. 611(c). The decision to allow leading questioning is in the discretion of the trial court. *Wyatt v. State*, 23 S.W.3d 18, 28 (Tex. Crim. App. 2000); *Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 308 (Tex. App.—[14th Dist.] 2000, no pet.). Abuse of discretion cannot be shown unless the appellant demonstrates he was unduly prejudiced as a result of such questioning. *Wyatt*, 23 S.W.3d at 28.

DeLisle cites no particular instances during Willett's testimony where leading questions caused her irreparable harm. Therefore, we overrule her second point of error.

## V. *Conclusion*

The order of the trial court is affirmed.

RICK STRANGE
JUSTICE

October 21, 2010

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.