**Opinion filed December 2, 2010**



## In The

# Eleventh Court of Appeals

_____

### No. 11-09-00321-CV

_____

## IN THE INTEREST OF J.R.H. AND J.T.H., CHILDREN

**On Appeal from the 29th District Court**

**Palo Pinto County, Texas**

**Trial Court Cause No. C42702**

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal of the trial court's order terminating parental rights. We affirm.

James Harvey is the father of J.T.H., and Brittany Harris is the mother of J.R.H. and J.T.H. Brad Guinn Allen is the adjudicated father of J.R.H. and is not a party in this appeal. At the time of trial, J.R.H. was three years old and J.T.H. was two years old. Harvey and Harris started dating when Harris was a few months pregnant with J.R.H. and later had J.T.H. together. The Department became involved with the family when J.T.H. was hit by a car when he was one year old. At that time, Harris and Harvey were living with Harris's mother and her boyfriend in a travel trailer. On the day of the incident, Harris put J.T.H. in the playpen and went outside. Her mother's boyfriend took him out of the playpen, and J.T.H. followed Harris outside. When Harris came back inside, she asked where J.T.H. was, and no one knew. She then saw J.T.H.

outside in the street, and he was screaming. Harris did not know what had happened to J.T.H., but it was later determined that he was hit by a car. J.T.H. was care-flighted to Cook Children's Medical Center. He suffered soft tissue swelling and bruising, but he did not have any broken bones.

The Department filed suit in which it sought protection for the children, conservatorship, and termination of parental rights. The Department alleged three acts or omissions as the basis for terminating Harris's parental rights as to J.T.H. and J.R.H. and terminating Harvey's parental rights as to J.T.H.[1] It alleged that Harris and Harvey:

> (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children;

> (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children;

> (3) failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the children's removal from the parent because of abuse or neglect of the children.

The foster parents filed a petition in intervention for termination of parental rights and for adoption. After the children had been in the Department's conservatorship for nine months, Harris and Harvey had worked most of the services but still had not reached their goals for reunification.

In June 2009, on the Department's motion, the trial court allowed the children to return home to Harris and Harvey on a monitored placement. However, the children were once again removed from the home less than a month later. The Department cited its concern for the welfare and safety of the children as well as the parents' failure to follow the service plan as reasons for the removal.

The trial court held a bench trial pertaining to the termination of the parental rights of Harris and Harvey as to J.T.H. At the conclusion of the trial, the court found that termination of

---

[1]The Department also initially sought to terminate Allen's parental right to J.R.H. but waived its claim at trial.

Harris's and Harvey's parental rights as to J.T.H. was in the best interest of J.T.H. and that both Harris and Harvey had:

> (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; [and]

> (2) failed to comply with provisions of the court order that specifically established the actions necessary for them to obtain the return of J.T.H. who had been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of his removal due to abuse and neglect.

The trial court further ordered that the Department be the permanent managing conservator of J.T.H. and that Allen be the permanent managing conservator of J.R.H. with Harris appointed as the possessory conservator of J.R.H.[2]

In separate briefs, Harvey and Harris appeal the trial court's order terminating their parental rights as to J.T.H. and J.R.H. In one issue, Harvey asserts that there is not clear and convincing evidence to support the grounds upon which the trial court found that his rights should be terminated and that it would not be in J.T.H.'s best interest for his rights to be terminated. We assume that with this issue Harvey is attacking the legal and factual sufficiency of the evidence to support the trial court's order.

In Harris's appeal, she challenges the trial court's order as to the termination of her parental rights to J.T.H in three issues. In the first issue, she asserts that the evidence was insufficient to support the trial court's finding that she knowingly placed or knowingly allowed J.T.H. to remain in conditions or surroundings that endangered the physical or emotional well-being of J.T.H. In the second issue, she asserts that the evidence was insufficient to support the trial court's finding that she failed to comply with the provisions of a court order that specifically established actions necessary for Harris to obtain the return of J.T.H. Finally, she asserts that there was insufficient evidence to support the trial court's finding that termination was in J.T.H.'s best interest.

In its brief, the Department concedes that there was insufficient evidence to support termination under the grounds that Harris knowingly placed J.T.H. in conditions that endangered his emotional and physical well-being. However, it argues that Harris does not challenge that portion of the trial court's order in which the trial court appointed the Department as the

---

[2] The Department was dismissed as to J.R.H. No party has appealed this part of the trial court's order.

managing conservator of J.T.H. The Department also does not concede error in regards to the trial court's order terminating Harvey's parental rights to J.T.H. Further, the intervenors, J.B. and R.B., do not concede error as to the termination of either Harris's or Harvey's parental rights. We will, therefore, discuss their issues on appeal.

Harvey does not challenge the trial court's specific finding on the reasons for termination. In his brief, Harvey states that the Department alleged those conditions for involuntary termination that are set out in TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (Vernon Supp. 2010). However, the Department alleged, and the trial court found, as grounds for termination those things set for termination in Section 161.001(1)(D), (O). The trial court need only find that one of the statutory grounds is true in order to support termination. *M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 309 (Tex. App.—El Paso 2009, pet. denied). Because Harvey does not challenge the trial court's finding that he failed to comply with the provision of the court order that specifically established the actions necessary for him to obtain the return of J.T.H., we need not address his argument that the evidence was insufficient to support the other ground found by the trial court.

In addition, Harvey waives any challenge to the trial court's finding that termination was in the best interest of J.T.H. Harvey mentions the best interest of the child one time in his brief. He states in his issue on appeal: "[I]t would not be in the best interest of the child that the parental rights between James Harvey and the child [J.T.H.] be terminated." Harvey does not include any substantive analysis or discussion of the evidence in support of his contentions. *See* TEX. R. APP. P. 38.1(h) (requiring an appellant's brief to contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record). Because Harvey has failed to properly brief this issue and raise it before this court, he has waived it. We overrule Harvey's issue on appeal.

We will now address Harris's challenges to the sufficiency of the evidence. Due process requires that the grounds for termination be established by clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This requires a measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *In re J.P.H.*, 196 S.W.3d 289, 292 (Tex. App.—Eastland 2006, no pet.).

To determine if the evidence is legally sufficient, we review all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a

firm belief or conviction that its finding was true. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d at 266; *In re J.P.H.*, 196 S.W.3d at 292. We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 149 S.W.3d 814, 817 (Tex. App.—Eastland 2004, no pet.). We must consider all the evidence, not only that which favors the verdict. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

To determine if the evidence is factually sufficient, we review the entire record, including evidence in support of and contrary to the judgment, and give due consideration to evidence the trial court could have found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We then determine whether the evidence is such that a factfinder could form a firm belief or conviction that grounds for termination exist. *Id.* We also consider whether any disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *Id.*

A court may order the termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the emotional or physical well-being of the child. Section 161.001(1)(D). Endanger means to expose to loss or injury or to jeopardize a child's emotional or physical health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied).

The evidence used to support this ground for termination concerns the child's environment and the acceptability of the child's living conditions. *In re D.J.J.*, 178 S.W.3d 424, 429 (Tex. App.—Fort Worth 2005, no pet.); *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). The Department must show that the child's living conditions posed a real threat of injury or harm. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.). Although it is not required that the parent have certain knowledge of an actual injury, there must be evidence that the parent was aware of the potential danger to the child and disregarded that risk. *In re C.L.C.*, 119 S.W.3d at 392. Conduct of a parent or of another person in the home can create an environment that endangers the physical or emotional well-being of a child. *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ).

Elizabeth Clement testified that she is an investigator for the Department. She testified that she received a report that a one-year-old was presented to the hospital for injuries that he sustained while he was not being properly supervised by his mother and was struck by a car. She

testified that she interviewed the parents, grandmother, and the nurses at the hospital. She testified that Harvey was asleep in the house at the time of the incident and that Harvey told her that Harris was the primary caretaker of the children. Clement testified that Harris told her that she went outside to talk to a friend and did not realize that J.T.H. had followed her. When she came back inside, she asked where J.T.H. was and then heard him screaming outside. Clement also testified that she talked to Harris's mother, Karen Melton. Melton told Clement that J.T.H. followed Harris around wherever she went and that Harris could expect him to follow her outside. Clement testified that she visited J.T.H. at the hospital. She was concerned about the care and attention he was receiving from Harris. She testified that she had to tell Harris not to let J.T.H. stand up on the bed because of the danger he would fall and had to remind her to change his diaper. She further testified that Harris mostly watched TV while J.T.H. was in the hospital.

Clement testified that, during her investigation, she found the home unsafe for children. The home had no air conditioning, there was an electrical cord strung over the house, the carpet was ripped up, unsafe items for children were in the front yard, and dogs were chained in the front yard. Because of the incident reported and the condition of the home, the Department removed the children.

Donna Massey testified that she was the assigned caseworker for J.T.H. starting in January 2009. She testified that the Department returned the children to Harris on June 15 and told Harris and Harvey she would check on them periodically. Massey testified that, the day after the children were returned to Harris and Harvey, she went by the house and observed J.T.H. and J.R.H. hanging out of a window with an almost three-foot drop. Massey testified that Harris did not seem concerned at all that the children were hanging out of the window and in danger of falling. Massey told Harris that they needed to put a screen on the window. However, Harvey fixed the window by nailing it shut. Massy testified that, after the children returned home, the Department was presented with concerns about their safety and, after discussing it, decided to remove the children again. Massey testified that the reasons for the second removal were because of the safety issue with the window, the house was very hot without any air conditioning in the room where the children played and slept, the failure to bond with the children, and the failure of Harris and Harvey to demonstrate basic parenting skills. Massey also testified that she did not believe that Harvey and Harris could parent together as a team. Harvey left all the caretaking of the children to Harris, and when she asked him to help, he ignored her. Massey testified that, in her opinion, Harris could not provide a safe and stable home for J.T.H.

6

Lena Biles testified that she was a case manager for Early Childhood Intervention (ECI). Biles testified that she had concerns with the home not having an air conditioner. She testified that J.T.H. was sleeping in a bedroom with no air-conditioning and was being put to bed in his diaper only. She testified that it was very hot at that time. Biles also testified that an earlier house that Harris and Harvey lived in did not have gas because it was turned off. Biles testified that J.T.H. was clean in the foster home and that, under Harris's care, J.T.H. was cleaner than some children she works with. However, she noted that his diapers were not getting changed.

Harris testified that she was the primary caretaker of the children. On the day that J.T.H. was hit by a car, she had changed J.T.H.'s diaper and put him back in the playpen. Her mother's boyfriend took him out of the playpen, and she walked outside. Harris testified that she knew that J.T.H. was out of the playpen and that he liked to follow her. Harris further testified that she knew that J.T.H. would follow her outside when she went out because he always followed her wherever she went. She even left the door open because she knew he would follow her. She testified that she got distracted and did not realize he was outside. Harris testified regarding the window incident that Massey observed. She testified that she thought J.T.H. was trying to open the window and that she had told him to leave it alone. She testified that she told Harvey that he needed to fix the window so that the boys could not open it. Harvey nailed the window shut to keep the children from opening it.

Harris further testified that, while they did have an air conditioner, it was not working very well. She testified that she was told by the caseworker that the children needed to sleep where there was air conditioning and that she made a pallet for them on her bedroom floor. She testified that they now have an air conditioner that works. Harris further testified that the home that the Department approved for the "monitor and return" was the same home that it argued at trial was an unsafe environment.

Harvey testified that the house they lived in had carpet and air-conditioning in the room that the children spent most of their time. He had a steady job since May 2009 at the Holiday Inn Express and made minimum wage. Harvey worked nights and slept during the day while Harris took care of the children. Harvey also testified that, at the time of trial, they lived with Mr. and Mrs. Gibson and their two children. He had been saving his money so that he and Harris could get their own house. Harvey said that he sometimes depended on the Gibsons for transportation because he did not have a driver's license.

The evidence shows that Harris allowed J.T.H. to wander outside by himself. J.T.H. was sleeping in a room without an air conditioner during the hottest part of the year. Harris was aware of the risk this posed to the children. She let J.T.H. sleep in her own air-conditioned room when told by the Department that the house was too hot for a baby to sleep without an air conditioner. The trial court, as the judge of the credibility of the witnesses, could have disbelieved Harvey's testimony that the house had an air conditioner and carpet. Massey testified that the house was not safe for young children. Even after the Department gave Harris the opportunity to show that she had learned from the services offered by the Department, she was unable to keep the children safe. J.T.H. was trying to climb out of a window with a three-foot drop below. Harris was aware of this risk of danger because she told Harvey that the window needed to be fixed and told J.T.H. not to try to open it.

Further, Harris's and Harvey's lives were unstable. They rented two bedrooms of a four bedroom house in which six people lived. Harvey's and Harris's testimony indicated that they wanted to have their own place, but nothing in the sixteen months before trial indicated that they were going to have a stable lifestyle. Harvey was unemployed for six months out of the sixteen months that the Department had conservatorship of the child. Prior to the Department removing the children, his driver's license was suspended due to his failure to have liability insurance on his vehicle, and he has been unable to get it back.

Based on the record before us, we believe that the evidence was factually and legally sufficient to support the trial court's finding that Harris knowingly allowed J.T.H. to remain in conditions that endangered the physical or emotional well-being of J.T.H. Because we find that the evidence was sufficient to support one of the grounds for termination, we do not need to discuss the second ground listed in the trial court's order. We overrule Harris's Issues One and Two.

In Harris's third issue on appeal, she challenges the sufficiency of the evidence showing that termination was in J.T.H.'s best interest. In parent-child termination proceedings, there is a strong presumption that the child's best interest is usually served by keeping him with his natural parents. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.); *In re K.C.M.*, 4 S.W.3d 392, 393-95 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). Best interest does not require proof of any unique set of factors. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976). However, the Texas Supreme Court has recognized several factors to consider in determining whether termination is in a child's best interest. *Id.* These include: (1) the desires of the child;

8

(2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Id*. at 371-72. This list of factors is not exhaustive, and no single consideration is controlling. *In re D.M.*, 58 S.W.3d at 814.

The emotional bond between the child and parents may be considered when determining the best interest of the child. *In re C.N.S.*, 105 S.W.3d 104, 106 (Tex. App.—Waco 2003, no pet.). When the child is too young to express a preference, other evidence regarding the child's current placement is relevant. *In re M.D.S.*, 1 S.W.3d 190, 200 (Tex. App.—Amarillo 1999, no pet.). Massey, Biles, and Clement all testified that Harris had not formed a bond with J.T.H. Massey testified that J.T.H. was doing really well in his placement with the foster parents. He was eating well, was in daycare, and seemed real happy. The foster parents had expressed an interest in adopting J.T.H. Biles testified that she observed the children in foster care and could tell a difference in how the children interacted. She testified that J.T.H. laughs and is more outgoing and self-confident. She testified that J.T.H. calls his foster mother "Momma." Harris testified that she knew that J.T.H. was being well taken care of in his foster home. She further testified that his needs were being met and that he was comfortable. Harvey expressed concern about J.T.H.'s well-being in the foster home. He testified that, every time he saw J.T.H., he had a new bruise, a new red mark, or a new bump on his head. Harvey testified that he felt the horses the foster parents had were just as unsafe as the home he could provide.

The record revealed several instances in which J.T.H.'s emotional and physical needs were not being met under the care of Harris. Harris had to be told of the risks associated with J.T.H. standing up in the hospital bed and had to be reminded to change his diaper. While J.T.H. was in the hospital, Harris was more interested in watching TV than keeping J.T.H. safe. Massey testified that Harris seemed unaware of how to discipline J.T.H. Once, when Massey was with Harris and the children in Wal-Mart, J.R.H. was screaming and crying and J.T.H. started to go out the door. Massey testified that Harris could not decide whether to take care of J.T.H. She looked to Massey to handle the situation. Biles also testified that she was concerned about J.T.H.'s diet. She testified that, when interviewing Harris, she determined that the children

would eat dry cereal and Kool-Aid for breakfast, one-half of a hot dog and Kool-Aid for lunch, and mashed potatoes and Kool-Aid for dinner. Massey testified that, on one occasion, she observed Harris sharing mashed potatoes with J.T.H. for breakfast.

The record indicates that Harris worked the services provided by the Department but was unable to apply what she learned in the everyday parenting of J.T.H. Massey testified that Harris and Harvey did not submit to any of the services until six months after the children were removed. Massey further testified that they were doing the services and checking them off one by one but were not applying them. Harris always expected Massey to handle the dressing, discipline, and feeding of the children when she was present. Biles also testified that she told Harris to feed J.T.H. cereal with a spoon instead of a bottle. Biles testified that Harris tried one time and J.T.H. was not able to do it. However, when Biles fed J.T.H. with a spoon, he did just fine. Harvey testified that he thought Harris relied on the Department too much and that he had asked her not to be so dependent on them.

At trial, there was some argument as to why Harris's rights could be terminated as to J.T.H. but not as to J.R.H. Massey testified that the Department was not seeking termination of Harris's rights to J.R.H. because there was an appropriate parent with whom he could be reunified. Further, it would not be a hardship in this case to separate the siblings because they have not lived together for very long. J.R.H. lived with Harris's sister for the majority of his life.

The evidence shows that Harris and Harvey have not provided a stable home for J.T.H. They have moved several times since J.T.H. was born. Harvey testified that they had to move from one house in Jacksboro because the landlord would not fix the pipes and they had no running water. He also testified that they had to leave another house because the landlord sold it and the new owners did not want to rent it. Further, Biles testified that they were in a home that had the gas turned off. Harvey and Harris now rent two bedrooms of a four bedroom house and live there with four other people. Harvey testified that he is saving up to get a place of his own. However, he was unemployed a majority of the time that the Department had conservatorship of the children. He obtained steady employment in May 2009, just over three months before trial. Harris testified that money had always been an issue. She testified that she could not afford to put J.T.H. in daycare and J.R.H. in preschool. Harris could not afford to fill a ten dollar prescription for J.T.H.'s ear infection. Harris had not been able to provide a stable environment for J.T.H. prior to the removal or while the Department had the children, and the record does not demonstrate how that would change if her rights were not terminated.

10

Looking at all the evidence and analyzing the above listed factors, we find that the trial court's finding that termination was in J.T.H.'s best interest was supported by clear and convincing evidence. We overrule Harris's third issue on appeal.

We affirm the order of the trial court.


JIM R. WRIGHT
CHIEF JUSTICE


December 2, 2010

Panel consists of: Wright, C.J.,
McCall, J., and Strange, J.