Opinion filed June 21,
2012

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-11-00232-CV 

                                                    __________

 

            IN THE
INTEREST OF M.N.M. AND W.J.M., CHILDREN



 

                                   On
Appeal from the 70th District Court

 

                                                             Ector
County, Texas

 

                                                 Trial
Court Cause No. A-2977-PC

 



 

M
E M O R A N D U M   O P I N I O N

            This
is an accelerated appeal of the trial court’s order terminating parental
rights.  After a bench trial, the trial court terminated the parental rights of
T.M. to her daughter, M.N.M., and to her son, W.J.M.  The father, W.M.,
relinquished his parental rights to the two children, and the trial court also
terminated his parental rights.  He has not filed an appeal.  The court
appointed the Texas Department of Family and Protective Services (the Department)
as the children’s permanent managing conservator.  

            In a
single issue, T.M. challenges the legal and factual sufficiency of the evidence
supporting the trial court’s findings that (1) T.M. had knowingly placed or
knowingly allowed the children to remain in conditions or surroundings that
endangered their physical or emotional well-being, (2) T.M. had engaged in
conduct or knowingly placed the children with persons who engaged in conduct that
endangered their physical or emotional well-being, and (3) termination was in
the best interest of the children.  We affirm.

Background
Facts

            Cyndi
Perez was the Department investigator assigned to this case.  Her affidavit was
attached to the Department’s petition.  Perez was available to testify at
trial, and her affidavit was introduced, without objection, into evidence as an
exhibit.  The attorneys stipulated that the affidavit would serve as the
principal portion of her testimony.  It provided a summary of the events
leading to the Department’s decision to seek a termination of parental rights
and the bench trial.

            T.M.
and W.M. had separated.  After the separation of T.M. and W.M. in April 2010,
the children had resided primarily with their mother.  On May 11, 2010, the
Department received a referral (apparently from W.M.), alleging physical
neglect of M.N.M. and W.J.M. by their mother.  W.J.M. was seven months old, and
M.N.M. was almost two years old.  W.M. had taken the children to be examined by
a doctor who found the children to be malnourished.  Both children were treated
for respiratory problems.  According to the father, T.M. threw the children’s
medications away after he took the children back to her.

            A
month prior to the referral, W.M. had become aware that the children were ill; T.M.
 had not sought medical attention for them despite W.M. encouraging her to do
so.  W.M. took the children to a doctor who diagnosed W.J.M. as having an ear
infection that had led to a sinus infection and then to “walking pneumonia.” 
W.J.M. could not keep his food down and had lost over two pounds since the
parents separated.  M.N.M. had lost over five pounds during the same period.  

            On
May 11, W.M. took possession of the children and saw that they were in poor
condition.  He delivered W.J.M. to his mother who lived in Gonzales; she
immediately took W.J.M. to a doctor.  Two days later, W.M.’s mother reported by
telephone to a Department caseworker that the doctor had diagnosed W.J.M. as
malnourished.  The doctor also had observed that the back of the infant’s head
was flat, possibly from being left in a car seat too long.  During that call,
W.M.’s mother advised the caseworker that W.M. had been diagnosed as being
bipolar and schizophrenic and that he could be very aggressive if he was not
taking his medications as prescribed.  She also made comments regarding T.M.
and stated that she did not believe that the children were safe in either
parent’s custody.  On May 17, Perez received a call from a caseworker in
Gonzales who confirmed that W.J.M. did appear to be malnourished.

            From
May 14 to June 2, Perez made a number of attempts to contact T.M.  Messages
were left on the door of the mobile home where T.M. was residing, and letters
were sent to T.M. advising T.M. that she needed to contact Perez.  Perez was
trying to locate T.M. and M.N.M.  On June 2, Perez learned that M.N.M. was with
her father; Perez and another investigator met with W.M. and M.N.M.  They
observed that M.N.M. was obviously behind in her development: M.N.M. could not
speak and walked only by holding on to something.  Her hair was thin, her skin
was pale white, her left foot was unstable, and her body was thin and lacked
muscle tone.  W.M. discussed with the investigators his difficulties in getting
the children medical treatment because of T.M.’s refusal to provide him with
their Medicaid cards and her refusal to administer medications the doctor had
prescribed.

            The
parents agreed to voluntarily place M.N.M. with T.M.’s aunt.  At that time,
T.M. reported to the Department that W.M. had used cocaine and other controlled
substances when they were together.  In Perez’s opinion, both parents had
exhibited poor judgment regarding the care and safety of the children that had
created precarious health situations for both children, including
malnourishment, developmental delay, and lack of medical treatment leading to
dangerous respiratory conditions.  Perez concluded that the mother had been
unconcerned about the children and had failed to provide them with adequate
nutrition and stimulation for their proper growth and development.  Neither
parent had demonstrated an ability to provide stable housing or employment to
provide for themselves.

            At
the bench trial, the Department called eight witnesses.  In rebuttal, T.M.
testified.  During final arguments, the guardian ad litem stated to the court
that he believed there were sufficient grounds to support a termination of
parental rights.  In the Order of Termination, the trial court found by clear
and convincing evidence that termination of the parent-child relationship
between T.M. and her two children was in the best interest of the children and
that T.M. had (1) knowingly placed or knowingly allowed the children to remain
in conditions or surroundings that endangered the physical or emotional
well-being of the children and (2) engaged in conduct or knowingly placed
the children with persons who engaged in conduct that endangered the physical
or emotional well-being of the children.




 

Standards
of Review

            Due
process requires that the grounds for termination be established by clear and
convincing evidence.  In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); In
re D.O., 338 S.W.3d 29, 33 (Tex. App.—Eastland 2011, no pet.).  This
requires a measure or degree of proof that will produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.  Tex. Fam. Code
Ann. § 101.007 (West 2008); In re J.P.H., 196 S.W.3d 289, 292
(Tex. App.—Eastland 2006, no pet.).

When
conducting a legal sufficiency review, we review all the evidence in the light
most favorable to the finding to determine whether a reasonable trier of fact
could have formed a firm belief or conviction that its finding was true.  City of Keller v.
Wilson, 168 S.W.3d 802, 817 (Tex. 2005); In re J.F.C., 96 S.W.3d at
266; In re J.P.H., 196 S.W.3d at 292.  We must assume that the
factfinder resolved disputed facts in favor of its finding if a reasonable
factfinder could do so, and we disregard all evidence that a reasonable
factfinder could have disbelieved or found to have been incredible.  In re
J.F.C., 96 S.W.3d at 266.

When conducting a factual
sufficiency review, we review the record as a whole, including evidence in
support of and contrary to the judgment, and give due consideration to evidence
that the trier of fact could have found to be clear and convincing.  In re
C.H., 89 S.W.3d 17, 25 (Tex. 2002); In re J.P.H., 196 S.W.3d at
292–93.  We then determine whether the  evidence
is such that a factfinder could reasonably form a firm belief or conviction
about the truth of the State’s allegations.  In re C.H., 89 S.W.3d at
25; In re J.P.H., 196 S.W.3d at 293.  We also consider whether any
disputed evidence is such that a reasonable factfinder could not have resolved
that evidence in favor of its finding.  In re J.F.C., 96 S.W.3d at 266; In
re J.P.H., 196 S.W.3d at 293.

To terminate parental rights,
the Department must prove that one statutory ground for termination has
occurred and that termination is in the best interest of the child.  In re
J.L., 163 S.W.3d 79, 84
(Tex. 2005); In re A.V.,
113 S.W.3d 355, 362 (Tex. 2003).  One ground for termination is that a parent
“knowingly placed or knowingly allowed the child to remain in conditions or
surroundings which endanger the physical or emotional well-being of the child.” 
Tex. Fam. Code Ann. § 161.001(1)(D) (West Supp.
2011).  Another ground for termination is that a parent “engaged in
conduct or knowingly placed the child with persons who engaged in conduct which
endangers the physical or emotional well-being of the child.” Id. § 161.001(1)(E).

“Endanger” means to expose to
loss or injury or to jeopardize a child’s emotional or physical health.  Tex.
Dep’t of Human Servs. v. Boyd,
727 S.W.2d 531, 533 (Tex. 1987); Phillips v. Tex. Dep’t of Protective
& Regulatory Servs.,
149 S.W.3d 814, 817 (Tex. App.—Eastland 2004, no pet.); Doyle v. Tex. Dep’t
of Protective & Regulatory Servs.,
16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied).  The conduct must be
more than a threat of metaphysical injury or the possible ill effects of a
less-than-ideal family environment.  However, it is not necessary that the
conduct be directed at the child or that the child actually suffers injury. Doyle, 16 S.W.3d at 394.  The cause of danger
to the child must be the parent’s conduct alone, as evidenced not only by the
parent’s actions but also by the parent’s omissions or failures to act. Doyle, 16 S.W.3d at 395; In re S.H.A., 728 S.W.2d 73, 85 (Tex. App.—Dallas
1987, writ ref’d n.r.e).  Termination must be based on more than a single act
or omission; a voluntary, deliberate, and conscious course of conduct by the
parent is required.  In re J.W.,
152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied); In re K.M.M., 993 S.W.2d 225, 228 (Tex. App.—Eastland
1999, no pet.).

            Under
Section 161.001(1)(D), it is necessary to examine evidence related to the
environment of the child to determine if the environment was the source of
endangerment to the child’s physical or emotional well-being.  In re D.T.,
34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied).  A child is
endangered when the environment creates a potential for danger that the parent
is aware of but disregards.  In re M.R.J.M., 280 S.W.3d 494, 502 (Tex.
App.—Fort Worth 2009, no pet.); see In re S.M.L., 171 S.W.3d 472, 477
(Tex. App.—Houston [14th Dist.] 2005, no pet.).

            Under
Section 161.001(1)(E), the relevant inquiry is whether evidence exists that the
endangerment of the child’s physical or emotional well-being was the direct
result of the parent’s conduct, including acts, omissions, and failures to
act.  In re M.R.J.M., 280 S.W.3d at 502.  As mentioned, a voluntary,
deliberate, and conscious course of conduct by the parent is required for
termination.  Id.

In
addition to proving that one statutory ground for termination has occurred, the
Department must prove that termination is in the best interest of the child.  In
re J.L., 163 S.W.3d at 84; In re A.V., 113 S.W.3d at 362; see
Tex. Fam. Code Ann. § 161.001(2)
(West Supp. 2011).  The focus is on the child’s best interest, not that of the
parent. Dupree v. Tex. Dep’t of Protective & Regulatory Servs., 907
S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ).  No
unique set of factors need be proved.  In re C.J.O., 325 S.W.3d 261, 266
(Tex. App.—Eastland 2010, pet. denied).  But courts may use the non-exhaustive Holley
factors to shape their analysis.  Holley v. Adams, 544 S.W.2d 367,
371–72 (Tex. 1976).  These include, but are not limited to, (1) the desires of
the child, (2) the emotional and physical needs of the child now and in the
future, (3) the emotional and physical danger to the child now and in the
future, (4) the parental abilities of the individuals seeking custody, (5) the
programs available to assist these individuals to promote the best interest of
the child, (6) the plans for the child by these individuals or by the agency
seeking custody, (7) the stability of the home or proposed placement, (8) the
acts or omissions of the parent that may indicate that the existing parent-child
relationship is not a proper one, and (9) any excuse for the acts or omissions
of the parent.  Id.  Additionally, evidence that proves one or more
statutory grounds for termination may also constitute evidence illustrating
that termination is in the child’s best interest.  In re C.J.O., 325
S.W.3d at 266.  A trier of fact may measure a parent’s future conduct by his or
her past conduct and determine that it is in the child’s best interest to
terminate parental rights.  In re D.S., 333 S.W.3d 379, 384 (Tex. App.—Amarillo
2011, no pet.).

Are
T.M.’s Issues Precluded From Review?

            As a
preliminary matter, the Department contends that T.M.’s issues are precluded
from review because she failed to file her statement of points within the
fifteen-day extension period as provided in former Texas Family Code Section
263.405.[1] 
The record shows that T.M. failed to timely file a statement of points for
appeal as required by former Section 263.405(b).  The Department asserts,
therefore, that we may not consider T.M.’s issues. See former Section 263.405(i)
(Providing that an “appellate court may not consider any issue that was not
specifically presented to the trial court in a timely filed statement of the
points”).  The Texas Supreme Court has held, however, that former Section
263.405(i) “is unconstitutional as applied when it precludes a parent from
raising a meritorious complaint about the insufficiency of the evidence
supporting the termination order.”  In re J.O.A., 283 S.W.3d 336, 339
(Tex. 2009).  In light of J.O.A., we will address T.M.’s challenges to
the sufficiency of the evidence.




 

Analysis

T.M.
complains that the evidence was legally and factually insufficient to support
the trial court’s order terminating T.M.’s parental rights because the
Department’s primary concern was T.M.’s poverty; because there was no evidence
of drug use, violence, criminal history, mental health issues, or inability to
maintain a home or provide food; and because T.M. complied with the court’s
orders.  We disagree with T.M.’s summary and analysis of the evidence.  The
record reflects that the Department had a number of concerns, including whether
T.M. could keep a job, provide a stable home and proper food for the children,
and attend to the children’s developmental needs.

            The
testimony of Perez, the Department’s investigator, was confirmed by the other
witnesses for the Department.  W.M. testified that he signed his rights over
because he “felt like the kids would be better with Barbara and Billy [Heath] than
anybody else” and that their adoption of the children would be in the
children’s best interest.  He testified that T.M. was not stable and that “[h]er
emotions [were] always flowing in the wrong direction.”  He discussed T.M.’s refusal to provide him with the children’s Medicaid cards despite the fact that
the children had been throwing up for months.  He made T.M. take him and the
children to the doctor; however, she did not go in with them to see the
doctor.  W.M. gave T.M. the medicine prescribed by the doctor; however, she
sent him a message that she had thrown the medicine away.

            W.M.
explained why he had taken the baby, W.J.M., to his mother.  T.M. brought
W.J.M. to W.M. one day and said that “she couldn’t stand the little bastard
anymore.”  W.M. called his mother, and his mother picked up W.J.M. and took him
to a doctor in Gonzales where W.J.M. was diagnosed as being malnourished.  Later,
T.M. brought M.N.M. to W.M., and W.M. saw that the child was not walking very
well and was “real thin.”  W.M. testified about his difficulty in getting to
see the children while they were living with T.M. at her boyfriend’s house.  At
some point, the children were “being left [by T.M.] at Ms. Bell’s house,” and
he attempted to have the police help him check on the children.  Apparently,
W.M. contacted the Department because he subsequently testified that Perez
became involved.  W.M. and T.M. agreed with Perez that the children should be
placed with the Heaths.  W.M. has visited the children once or twice a week since
they were placed with the Heaths.  In the Heaths’ home, the children have
recovered their health, and they are now happy and talking.

            Dr.
Mary Beth Hart, an assistant professor of pediatrics with Texas Tech
University, testified that she has been seeing the two children for one and
one-half years.  Her diagnosis of M.N.M. had been “failure to thrive,” due to
lack of food or illness; M.N.M. was not proceeding in her development as she
should have been compared with her age group.  Dr. Hart said that she had
discussed with the father M.N.M.’s failure to thrive.  She testified that their
father brought them in regularly and that she saw T.M. with the children on
only one visit.  Dr. Hart has continued to see the children since their placement
with the Heaths.  The children’s condition has improved, and they have
progressed in their development.  W.J.M. has progressed from the low fifth
percentile to the twenty-fifth percentile to the fiftieth percentile.

            Barbara
Heath testified that M.N.M. began residing in the Heaths’ home in June 2010;
M.N.M. was twenty-three months old at the time.  She described M.N.M. as being
underweight and pale, barely walking, and saying very few words.  Heath took
M.N.M. to the emergency room the next day because M.N.M. had an upper
respiratory infection and a high fever.  Heath contacted Early Childhood
Intervention for an evaluation, and ECI began providing services to M.N.M. 
M.N.M. has improved in her walking and in her speech; however, she is still
behind in development.  M.N.M. has also gained weight and become healthy.

            Heath
said that W.J.M. began residing in their home in October 2010.  W.J.M. was
throwing up.  They took W.J.M. to a specialist who diagnosed W.J.M. as having
acid reflux.  W.J.M. was in better health than M.N.M. was when she arrived
because he had been living with his paternal grandmother in Gonzales for about
six months and she had helped him gain weight and develop.      Heath testified
that T.M. had not been to visit the children for over three months.  She had
seen T.M. during visits at the Department.  She and T.M. would visit while the
children were at the Department.  Heath testified that she and her husband
wanted to adopt the children because she believed that would be in the children’s
best interest.  She testified that the children needed stability and a good
environment and that the Heaths would provide stability and a good environment.

            Joanna
Hatley, an ECI specialist, testified that she was working with M.N.M. and
W.J.M.  M.N.M. was three at the time of trial, and W.J.M. was twenty-one months
old.  Hatley discussed how she has helped the children in their physical
development and has helped Heath with the nutritional needs of the children. 
When Hatley started M.N.M on the ECI program July 1, 2010, M.N.M. was eleven
months behind in her walking and gross motor skills; she was in the fifth
percentile.  Hatley expressed her opinion that T.M. had not worked with M.N.M. 
Hatley discussed what she and Heath had done in response to the doctor’s
diagnosis of M.N.M. as “failure to thrive.”  Hatley explained that “failure to
thrive” simply meant malnutrition: that a child was not getting enough food.  According
to Hatley, M.N.M. has made substantial progress and is no longer malnourished. 
Hatley also expressed her opinion that M.N.M. was behind in her development due
to neglect.

            Hatley
testified that she had noticed that M.N.M.’s head is misshapen and that, after
eighteen months and two years of age, the head of a child cannot be changed. 
M.N.M.’s head is a bit flat on one side, which indicates that she was left
lying in one position too long.  When younger than eighteen months, children
often are not able to get up and move around as they should.

            ECI
was also providing services to W.J.M., who was behind in developing his
adaptive and self-help skills when he moved to the Heaths’ home.  She also
testified that W.J.M. had trouble in calming himself when he arrived.

            Connie
Mudd, a speech therapist with ECI, testified that she had worked with M.N.M.
during the past year and that W.J.M. also participated in the therapy.  She
found that M.N.M. had no neurological reason for being behind in her speech but
stated that speech developmental delay is often caused by the child “being
deprived of experiences, not being taken out, not playing with other children,
just being planted in front of the TV.”  Mudd said that M.N.M. was just hungry
for attention.  Mudd said that she would call Heath to tell Heath that she was
coming and that, when she arrived, M.N.M. would be sitting at the table ready
to work with Mudd.

            Kirsten
Stringer provides occupational therapy for ECI.  She worked with W.J.M. to
address coordination issues, sensory processing problems, and staying on task. 
W.J.M. had a sensory problem.  It would appear that he had temper tantrums.  He
had a difficult time staying focused and would throw himself down on the floor
and hit his head.  But Stringer discovered that his body was seeking input. 
W.J.M. was beating his head trying to gain input to help organize his sensory
system, after which he was able to concentrate on what he needed to do.  The
instances would appear to be a temper tantrum, but they were not always from
anger.  Stringer explained that his behavior could have been from neglect and
from being left in a baby seat too long.  Stringer said that they often see
similar behavior in babies that have been left in one area and not played
with.  Stringer testified that she and Heath had given W.J.M. joint
compressions to his body and that the technique had helped him.

            Stringer
discussed how W.J.M. initially could not sit down and play for any length of
time.  His actions were not normal for a one-year-old.  She and Heath had
worked with W.J.M. in that area to help him develop attention-to-task skills.  In
addition, W.J.M. needed help in learning how to eat with a spoon and in
learning other self-care skills.

            Stringer
noticed at the beginning that W.J.M. had a flat head, stating that most of the
time that indicated that the child had been left in one particular position for
an extended length of time.  When a child is left in a certain position for a
long period of time, their young heads conform to that position.  Stringer
testified that it was too late to change W.J.M.’s head shape when she started
working with him.  Stringer was very complimentary in discussing Heath’s
efforts with W.J.M.  She stated that W.J.M. had made substantial progress in all
areas of development.

            Samantha
Sanchez was the Department’s caseworker for the children for over a year.  Sanchez
testified that her major concerns were that T.M. had not maintained a stable
home or a stable job.  Sanchez said that T.M. had completed the service plan
but had not implemented those lessons into her lifestyle.  T.M. failed to
demonstrate that she had changed.  In Sanchez’s opinion, T.M. had failed to
acknowledge that the children were not healthy and that they were not
developing.  Sanchez discussed with T.M. that the service plan required her to
demonstrate a willingness and ability to protect the children from harm;
however, T.M. blamed her situation on others and her environmental
surroundings.

            Sanchez
testified that T.M. had first worked at Dollar General and then worked at the
Palms Apartments as a manager.  Sanchez did not know why T.M. left the Palms
Apartments job, but she knew that T.M. then worked at Smokers Outlet.  However,
it was Sanchez’s under-standing that T.M. was unemployed at the time of trial.

            Sanchez
explained that T.M. had weekly contact with her children at the Department’s
office and that the visits had gone well.  The only issue that the Department
had with T.M. was that T.M. would often forget to change diapers.  The visits
were one hour each time.  In Sanchez’s opinion, T.M. had not demonstrated an
acceptance of the responsibility of being a parent.

            Sanchez
testified that, when the Department removed the children, T.M. was living in a
trailer with her boyfriend or friend and his father.  At one point, T.M. and
the children had lived with her mother.  Sanchez said that the Department would
not recommend that living arrangement because T.M.’s mother had not seen or
acknowledged that the children were undernourished and not doing well
physically.

            Sanchez
concluded by stating that the Department’s recommendation that T.M.’s parental
rights be terminated was based on the individual recommendations of everyone
who had worked with T.M.  Sanchez and the Department personnel would be
concerned for the children’s safety if the children went back to live with T.M.
 Sanchez admitted that all of T.M.’s drug tests were negative.  Sanchez
discussed her opinion that the children’s physical and emotional well-being had
been in danger when living with their parents.  She testified that putting them
back into an environment with T.M. could lead to the same problems again.  Although
T.M. had worked, her income was only sufficient to support herself; it was not
sufficient to support her and her children.  Sanchez emphasized the importance
of the children’s continued requirement for speech and mental therapy services
and stressed that a parent had to continue working with them as the Heaths had.

            T.M.
testified that she was currently living with her mother in a three-bedroom
trailer house.  T.M.’s sister and the sister’s daughter also lived there.  She
requested that the court return the children to live with her at her mother’s
home.  She claimed that she had given the children the medicine that W.M. had
given to her and that she had then thrown the remaining medicine away.  She
denied that she had ever failed to change the children’s diapers.  T.M. said
that she still worked at the Palms Apartments for five or ten hours a week at
$9.00 per hour and that she had taken another job at Auto Zone for twenty-five
to thirty hours a week at $8.22 per hour.  T.M. related what she had learned
about parenting, especially in the Project Adam class she had taken.  She
stated that she was continuing to take classes.  T.M. acknowledged that she had
not been to the Heaths’ home in three months because of working two jobs, but
she pointed out that she had visited with the children each week at the
Department.  T.M. also said that she had a good relationship with the Heaths.

            In
closing statements, the guardian ad litem for the children stated that he
believed there was sufficient evidence for a termination of T.M.’s parental
rights.  The children were in danger when they were taken from their mother;
she did not perceive the danger that should have been obvious to her.  He
further stated that the stability the children have with the Heaths is very
important to them.

            These
children were neglected when they were the most vulnerable: M.N.M. was three
years old at the time of trial, and W.J.M. was twenty-one months old.  It is
fortunate that W.M. contacted the Department for help when he did.  While the
children continued to reside with their mother, their father recognized that
the children needed medical attention.  T.M. did not recognize their health
problems and refused to provide him with their Medicaid cards.  Neither T.M.
nor her mother recognized that the children were malnourished.  T.M. is to be
commended for working and for completing the Department’s service plan, but it
appears that she has not been able to take the parenting lessons and put them
into practice.  Sanchez testified that the recommendations by the Department
personnel, based on their own observations and on reports by ECI personnel,
were that T.M.’s parental rights should be terminated.

            There
was testimony that both parents had exhibited poor judgment regarding the care
and safety of the children, thereby creating dangers to their health and
well-being.  The children’s misshapen heads were noted by the doctors and the
caseworkers.  All opined that their flat heads were due to being left in one
position too long.  The mother allowed the father to have unsupervised
possession of the children despite knowing of his mental health problems and
aggressive behavior if he failed to take his medications.  And the father
allowed the children to remain in an unstable environment with their mother
despite knowing that the children needed medical attention.  Prior to the
Department becoming involved, the children suffered from malnourishment,
developmental delay, and lack of medical treatment that had led to serious
respiratory illnesses.  T.M. failed to provide adequate nutrition and
stimulation to the children for their proper growth and development.  A
factfinder may infer from past conduct endangering a child’s well-being that
similar conduct will recur if the child is returned to the parent.  In re
M.R.J.M., 280 S.W.3d at 502.

            The
evidence was legally and factually sufficient to support the trial court’s
findings that T.M. (1) knowingly placed or knowingly allowed the children to
remain in conditions or surroundings that endangered the physical or emotional
well-being of the children and (2) engaged in conduct or knowingly placed
the children with persons who engaged in conduct that endangered the physical
or emotional well-being of the children.

            Having
reviewed the evidence in the light most favorable to the best interest finding
under the Holley factors, we hold that the trial court could have formed
a firm belief or conviction that terminating appellant’s parental rights was in
the best interest of M.N.M. and W.J.M. The record reflected that the children
had made substantial progress in their development and return to health while
in the Heaths’ home.  We hold that the evidence was legally and factually
sufficient to support the trial court’s termination of the parental rights of T.M.
as being in the best interest of M.N.M. and W.J.M.  T.M.’s sole issue on appeal
is overruled.

This
Court’s Ruling

            The order
of the trial court is affirmed.

 

                                                                                    

                                                                                                TERRY
McCALL

                                                                                                JUSTICE

 

June 21, 2012

Panel consists of: Wright, C.J.,

McCall, J., and Kalenak, J.









[1]Former Tex. Fam.
Code § 263.405 (2007) was amended in part and repealed in part.  See
Act of May 5, 2011, 82d Leg., R.S., ch. 75, §§ 4, 5, 8, 2011 Tex. Gen. Laws
348, 349.  The more recently revised provisions of Section 263.405 apply only
to termination orders signed on or after September 1, 2011.  The former law was
continued for orders signed prior to that date.  Id.